Thomas S. Lambert, Plaintiff in Error, v. The People of the State of New York, Defendant in Error.

Where, in an indictment for perjury in verifying an affidavit, it is alleged that the oath was absolute and unqualified, and that the same was untrue, and where it appears by the affidavit that the averments therein were made upon "information, knowledge and belief," a conviction cannot be had under the indictment; it should negative, not only the truth of the oath, but also the information and belief.

In an affidavit, made by plaintiff in error and another as officers of an insurance company, attached to a return made by the company to the insurance department, it was affirmed that deponents were "officers of the said company, and that on the thirty-first day of December last, all of the above described assets were the absolute property of the said company, free and clear from any liens and claims thereon, except as above stated; and that the foregoing statement, with the schedules and explanations * * * are a full and correct exhibit of all the liabilities and of the income and disbursements, and of the general condition and affairs of the said company, * * * according to the best of their information, knowledge and belief." Held (Miller, J.; Earl and Andrews, JJ., concurring; Hand, J., dissenting), that the qualifying words, information and belief," applied to the whole sentence, not simply to the part succeeding the semi-colon; and that an indictment for perjury, alleging the affirmation as to assets to be positive, and untrue, could not be sustained.

A witness for the prosecution, after testifying that upon applying to the prisoner for information, he was referred to R., the prisoner stating, in substance, that R. was the book-keeper and chief man, and would furnish whatever information was contained in the books, was permitted to testify, under objection and exception, to declarations of R., in the absence of the prisoner. to the effect that certain entries in the books of the company, as to policies issued, were false, and that the prisoner knew of it.

Statement of case.

*Held,* error; that the reference to R. did not confer authority upon him to bind the prisoner by his declarations.

The affidavit purported to have been sworn to before a notary public. The prosecution proved that M., the alleged notary, had acted as such for some years, and produced a book from the county clerk's office containing a list of notaries, the time of their appointments, etc., among which appeared the name of M. Defendant in error offered to prove that M. at the time of his alleged appointment, and at the date of the verification, was a resident in the State of New Jersey. This evidence was rejected. *Held,* error; that it was necessary for the prosecution to show that the oath was taken before a *de jure or de facto* officer; that the evidence given for that purpose was, at best, but *prima facie,* and proof that the alleged notary was a non-resident, and so incapable of holding the office (1 R. S., 116, § 1) was competent to rebut any presumption arising from such evidence.

*Lambert* v. *The People* (14 Hun, 512), reversed.

(Argued November 22, 1878; decided February 18, 1879.*)

ERROR to the General Term of the Supreme Court, in the first judicial department, to review judgment affirming a judgment of the Court Oyer and Terminer in and for the city and county of New York, entered upon a verdict convicting the plaintiff in error of the crime of perjury. (Reported below, 14 Hun, 521.)

The perjury charged was in swearing to an affidavit attached to a statement made, as required by law, by the accused, as president of the American Popular Life Insurance Company, for the year 1876, and deposited in the office of the superintendent of the insurance department.

The alleged perjury was in swearing to three items in the statement of assets of the company, to wit: loans secured by collaterals, cash and "gross premiums, due and unreported on policies in force."

The affidavit was as follows:

"STATE OF NEW YORK, ⎱ *ss :*
 *County of New York,* ⎰

"T. S. Lambert, president, and James Cruikshank, secretary, of the American Popular Life Insurance Company,

---

* This decision was, in fact, made December 20, 1878, while HAND, J., was a member of the court, but was not announced until the date above stated.

being duly sworn, depose and say, and each for himself says, that they are the above described officers of the said company, and that on the thirty-first day of December last all the above described assets were the absolute property of the said company, free and clear from any liens or claims thereon, except as above stated ; and that the foregoing statement, with the schedules and explanations hereunto annexed and by them subscribed, are a full and correct exhibit of all the liabilities and of the income and disbursements, and of the general condition and affairs of the said company on the said thirty-first day of December last, and for the year ending on that day, according to the best of their information, knowledge and belief, respectively."

> " T. S. LAMBERT, *Pres.*
> "JAMES CRUIKSHANK, *Sec.*"

Subscribed and sworn to before me, this }
   12th day of March, A. D. 1877.  }
  " W. H. MELICK, *Notary Public for New York, in the city and county of New York.*"

The further facts appear sufficiently in opinion of MILLER, J.

*Abram Wakeman,* for plaintiff in error. It was error to reject evidence of the non-residence of the alleged notary. (3 R. S. [6th ed.], 955, § 1; *Rex* v. *Verelst,* 3 Camp., 439; *Wilcox* v. *Smith,* 5 Wend., 231, 235; *People* v. *Albertson,* 8 How. Pr., 363; *Morrell* v. *People,* 32 Ill., 499; 1 R. S., 414, § 1; *Wood's Case,* 4 City Hall R., 130; *People* v. *Travis,* 4 Park. Cr., 213; 2 Hawkins Pleas of Crown [7th ed.], 86; 2 Arch. Cr. P., 1722, and note 1.) The court erred in allowing the affidavit of the plaintiff in error, and the statement attached to it, to be read in evidence. (Smith's Com. Stat. Const., 634, § 491; *Smith* v. *People,* 1 Park. Cr., 317.) The words, according to the best of his "information, knowledge and belief," at the end of the affidavit, referred to and qualified the whole of it. (Dwarris on Statutes, 704; *Coxson* v. *Doland,* 2 Daly

N. Y. C. P. R., 66; *Fitzgerald* v. *Mason*, N. Y. Sup. Ct., Third Dept.; 7 Weekly Dig., No. 8, p. 182.) The punctuation of a sentence is not to be regarded in its construction. (Sedg. on Statutory construction, [2d ed.], 225; *Gyger's Estate*, 65 Penn., 311; *Cushing* v. *Warrick*, 75 Mass., 382–385; *Hamilton* v. *Steamboat R. B. Hamilton*, 61 Ohio [N. S.], 428, 432.) The plaintiff in error should have the benefit of any doubt arising upon the construction of the affidavit. (*U. S.* v. *Clark*, 1 Gal., 496.) The averment in the indictment, that the affidavit was an absolute one, not having been proved, the conviction was erroneous. (2 Chitty's Crim. L., 312, 320; Roscoe's Crim. Ex., 822; Wharton's Crim. L., 226; *State* v. *Lea*, 3 Ala. [N. S.], 605; *Commonwealth* v. *Brady*, 71 Mass., 78; *Williams* v. *The State*, 7 Hamph., 48; *Burns* v. *The People*, 49 Barb, 532; *Regnia* v. *Sclesinger*, 10 Q. B. R., 670.)

*Benj. K. Phelps*, for defendant in error. The notary, before whom the affidavit was taken, was an officer *de jure*, and an offer to show that he was a non-resident at the time of his appointment could not be received. (*Read* v. *City of Buffalo*, 3 Keyes, 447.) The notary being an officer *de facto*, holding under appointment by authority, his acts were valid as to the public and all third persons, except in a proceeding to try his title to the office. (*Wilcox* v. *Smith*, 5 Wend., 233; *People* v. *Collins*, 7 J. R., 549; *McInstry* v. *Tanner*, 9 id., 135; *Albertson's Case*, 8 How. Pr., 363; *People* v. *White*, 24 Wend., 520; *People* v. *Stevens*, 5 Hill, 630; *Greenleaf* v. *Low*, 4 Den., 168; *People* v. *Hopson*, 1 id., 579; *Thompson* v. *State*, 21 Ala., 53; *State* v. *Carroll*, 38 Conn., 449; *People* v. *Cook*, 8 N. Y., 67; *State* v. *Hascall*, 6 N. H., 352; 2 C. & H., 1101; *Van Steenburgh* v. *Kurtz*, 10 J. R., 167; *Howard* v. *Sexton*, 1 Den., 440.) The books, checks, etc., of the company were competent evidence. (*U. S.* v. *Wood*, 14 Pet., 430; *Bk. of Monroe* v. *Culver*, 2 Hill, 531; *White* v. *Ambler*, 8 N. Y., 170; *Jermain* v. *Denniston*, 6 id., 276; *Shelden* v. *Benham*, 4 Hill,

129; *Stroud* v. *Tilton*, 3 Keyes, 139.) The evidence of McCall, as to the statements of Reid to him about the books of the company, was properly received. (*Wehle* v. *Spelman*, 1 Hun, 634.) There was no defect in the form of the indictment. (*McKinney* v. *People*, 3 Park., 510; *Campbell* v. *People*, 8 Wend., 636; *People* v. *Phelps*, 5 id., 9; *People* v. *Warner*, id., 271.) The charge excepted to, as to the degree of proof required, was correct. (*U. S.* v. *Wood*, 14 Pet., 430; *Reg.* v. *Hook*, 8 Cox C. C., 5; *Woodbeck* v. *Keller*, 6 Cow., 121; *People* v. *Burden*, 9 Barb., 467; *Comrs.* v. *Parker*, 2 Cush., 212; *Hendricks* v. *State*, 26 Ind., 493; *Reg* v. *Webster*, 1 F. & F., 515; 2 B. & H. L. Cr. Cas. [2d ed.], 88.)

MILLER, J. One of the most serious questions presented by the error book in this case arises in reference to the construction to be placed upon the affidavit in which the alleged perjury is charged to have been committed. It is claimed by the counsel for the prisoner that the affidavit was made upon "information, knowledge and belief," while the indictment avers that the oath was absolute and unqualified, and the traverse simply avers it to be untrue.

It is not denied that if the verification was, as claimed, on information, knowledge and belief, that the indictment should have traversed and negatived not only the truth of the oath, but also the information and belief; and if the oath was thus qualified, the conviction was erroneous. The affidavit was appended to statements to be made by life insurance companies, which, with the verification, were prepared and issued in blank from the insurance department. The first part of the affidavit states that the deponents named therein are the "officers of the said company, and that on the 31st day of December last, all the above described assets were the absolute property of the company, free and clear from any liens or claims, except as above stated." Here a semi-colon is inserted, and then follows an allegation "that the foregoing statement, with the schedules and explana-

tions hereunto annexed and by them subscribed are a full and correct exhibit of all liabilities, etc., * * * on the said thirty-first day of December last, with the year ending on that day," and the concluding clause preceded by a comma, viz.: "according to the best of their information, knowledge and belief, respectively." The claim of the prosecution is that all matters preceding the semi-colon are stated unqualifiedly, and that the remainder is qualified by information and belief. It will thus be seen that the legality of the conviction, so far as the question considered is concerned, depends entirely upon the insertion of a semi-colon, between the words stated in the sentence referred to, instead of a comma. The point is certainly a very fine one; but it must be determined in strict accordance with the principles of construction applicable to language which is employed in such a connection. According to well established grammatical rules, a semi-colon is a point only used to separate parts of a sentence more distinctly than a comma. Having in view this definition, and the circumstances under which the affidavit in question was made, there is strong ground for claiming that the insertion of a semi-colon, instead of a comma, did not render the previous words employed positive and absolute, and prevent their being qualified by the concluding clause of the affidavit. Aside, however, from this, it may also be remarked that punctuation is by no means an arbitrary standard, which is to control the meaning and construction of a sentence in opposition to the actual meaning of the writing. This rule prevails in the construction of statutes: (Sedg. on Stat. Cons., 225, note; *Gyger's Estate*, 65 Penn., 311; *Hamilton* v. *Steamboat R. J. Hamilton*, 16 Ohio, 428, 432); and punctuation is disregarded in ascertaining their true intent and meaning. The same rule, we think, is applicable to written instruments or writings, for the very same reason. It is often made by the printer alone, without regard to the framer or author of the writing or document; and some of the ablest, and most learned and accurate of writers give but little attention to the punctuation of the own pro-

ductions. It certainly would be going very far, to hold that a person could be convicted of a crime as flagrant as that of perjury, which depends entirely upon the question arising as to the intention of the party, and can only be committed with full knowledge of the falsity of the allegation, and which must, at the same time, be willful, corrupt and malicious, upon the mere insertion of a single dot in a sentence, and solely upon a question of precise, accurate and grammatical punctuation.

To uphold the conviction here we must assume that the accused understood perfectly the effect of the affidavit; that he examined it critically, and considered the force of the commas and semi-colons made therein ; before he took the oath. It may have been that he was ignorant, and the proof does not establish that he had knowledge of the effect of the various clauses which were punctuated ; and on a point so critical and nice, it is not going very far, to assume that he may have supposed very naturally that the closing words qualified the entire affidavit. Upon a question so close and exact, it cannot, we think, be claimed that it must be held, as a matter of law, under the circumstances existing, that the accused committed willful and corrupt perjury. The crime of perjury cannot be predicated upon such a state of facts, as the essential elements of willfulness, corruption and malice are not manifest. A possible misconception, or a mistake, in swearing as to the construction of a written instrument, is not enough to warrant an indictment and conviction for perjury. (*Rex* v. *Crespigny,* 1 Esp., 280; *U. S.* v. *Conner,* 3 McLean, 573; *U. S.* v. *Stanley,* 6 id., 409; 3 Wharton, §§ 2199, 2200; *Steinman* v. *McWilliams,* 6 Penn., 170, 178.) Nor can the charge be upheld upon the ground that the punctuation is not necessarily controlling, as no fair construction of the affidavit authorizes the inference that the accused intended to swear absolutely and unqualifiedly as to that portion of the affidavit which precedes the semi-colon referred to, and otherwise as to the remainder. No reason exists for swearing to nearly all the schedules with a qualification, and to a

comparatively small portion of them absolutely ; and it is not by any means unreasonable, to hold that the intention was to embrace all of these in the concluding clause of the affidavit, which includes what the affiant knew, as well as that portion in regard to which he had any information or belief. This interpretation is not only in accordance with the *grammatical*, but I think it accords with the legal rule in the construction of statutes, that where general words occur at the end of a sentence, they refer to and *qualify* the whole. (*Coxson* v. *Doland*, 2 Daly, 68, and authorities cited.)

It is said that the statements which precede the semi-colon were subjects which might be considered within the personal knowledge of the accused. This is undoubtedly the fact as to the statement that he was an officer of the company ; and his " knowledge," in this respect, is expressly provided for in the concluding clause of the affidavit, as we have already seen.

As to the allegation, however, that the assets named were the absolute property of the company, there is no ground for claiming that he had absolute knowledge in regard to them, any more than as to numerous other items contained in the schedules. There is strong reason for claiming that the accused knew that the statement was a full and correct exhibit of all the liabilities, and of the income and disbursements, and of the general condition, quite as well as that he had knowledge of the property and assets which belonged to the company ; and it is a strained, forced, and an unreasonable interpretation, to hold that the accused, who made oath to an affidavit prepared and furnished by the insurance department, intended to make a discrimination as to its different parts, and was fully aware that he had done so. There is nothing, either in its language or in the subjects mentioned therein, which warrants any such conclusion. No reason exists for verifying a portion of the items absolutely, which is not entirely applicable to all of them ; and if it had been intended to make any such distinction, it should have appeared in the affidavit, by ending the sentence at the semi-colon and

commencing another, which would have expressed the design of the affidavit to change the residue to knowledge, information and belief. This could easily have been done, by the insertion of a period and these words, "this deponent further says," after the semi-colon; and thus no question would remain as to what actually was intended. As the indictment avers an affidavit which was positive and unqualified, and the proof shows that it was qualified, it necessarily follows that the conviction cannot be upheld.

It is urged that there was error upon the trial in admitting the witness McCall to testify to the declarations of one Reed, in the absence of the prisoner, as to certain policies alleged by the prosecution to have been falsely issued. These declarations consisted of a conversation between the witness and Reed, in which the witness told Reed that "Mr. Ballard had said to him that Mr. Reed had said to Ballard that to save time they would find all that false issue marked by a blue pencil," and "that it would save time to mark them in that way; " that Reed replied that he had, since the witness told Ballard, consulted both the officers of the company, and that he declined to say anything more than that Lambert knows all about it, and can tell you if he wants to. Reed further said: "They were all false or bogus. He did not use the word bogus, but false issue. He, Reed, said there was two or three which were not. All of those uncollected premiums."

These declarations of Reed were made in the absence of the prisoner; and the evidence tended to establish that Lambert was guilty. The "blue pencil marks" in the books, without evidence to show that the accused had any knowledge of or anything to do with them, or any evidence as to who made them, were allowed to go to the jury, as well as the subsequent testimony, based entirely on hearsay, and the declarations of Reed as to the false issue of policies. In other words, the conviction of the prisoner was sought to be obtained, upon the declarations of a third person as to the assets of the company and the truth of the affidavit to

which he had made oath. No question would ordinarily arise as to the illegality of such evidence. It is claimed, however, by the prosecution that the witness McCall was referred to Reed by the prisoner for information, as the person who knew all about the books, and therefore what Reed stated was competent. I think that the evidence was entirely insufficient to confer authority upon Reed to bind the prisoner by his declarations. The proof on this subject is the evidence of McCall, who was deputy superintendent of the insurance department and who went to the office of the company for the purpose of making an investigation as to its affairs. He swears, on his direct examination, " that the prisoner said Reed was book-keeper and chief man, and would furnish me with the information I wanted," and upon his cross-examination, that the prisoner went with him to Mr. Reed, and said, " This is Mr. McCall, who will call for whatever books he wants; you will wait on him and give him what he wants." Also that " Mr. Reed is our chief man here." These declarations amounted to nothing more than a statement that Reed, who had charge of the books, would furnish what information was contained in the same, and conferred no power upon Reed to make declarations for which the prisoner would be held responsible. The facts presented bear no analogy to a case where the witness is referred to another person as to a particular fact, and the declarations of such person are allowed as testimony ( *Wehle* v. *Spelman*, 1 Hun, 634), as the declarations of Reed went far beyond furnishing the evidence as to any fact, and included his opinion as to the character of the entries referred to. It is no answer, to say that if Reed was mistaken, or if the books did not establish the facts alleged, it could have been proven that they were wrong, for the prosecution was bound to make out a case, by competent testimony ; and while the prisoner was required to meet the facts proven, he was not called upon to answer the declarations of Reed as to the false issue of policies. Nor can it be claimed, I think, that the testimony was innocuous and of no account, because the

evidence was sufficient to show guilt without it; for it is impossible to determine how far declarations of this kind might affect the minds of the jury, in determining the question as to the guilt or innocence of the prisoner upon trial.

It is by no means clear that the evidence may not have been the very turning point upon which the verdict of the jury was founded; and the decision of the judge, in admitting the testimony, was manifestly erroneous.

Upon the trial, the counsel for the prisoner offered evidence for the purpose of showing that the notary, before whom the affidavit was taken, at the date of the same was, and for eighteen months previously had been a resident of the State of New Jersey, and that his family resided there. The affidavit bore date upon the twelfth day of March, 1877, and the indictment averred that he was then a notary public of the city and county of New York, " having full, competent and lawful authority to administer the said oath."

The testimony for the prosecution showed that the notary had an office in the city of New York, and that he had acted as notary for some years. It was also proved by the equity clerk of the Supreme Court, who produced a book from the county clerk's office, that it contained a list of the notaries and time of their appointment, qualification, etc.; and the date of the appointment of the notary who took the oath was stated to be upon the tenth of March, 1876, and also that his term would expire upon the thirtieth day of March, 1878. The testimony offered by the prisoner's counsel would establish that at the time when the notary was appointed, and ever since then, he was a resident of the State of New Jersey. According to the statutes of this State, no person is capable of holding a civil office who, at the time of his appointment, is not a citizen of the State. (1 R. S., 414, § 1.) It was a material and important fact for the prosecution to establish, that the oath was legally administered (3 R. S. [6th ed.], 955, § 1), and the authority and jurisdiction of the officer before whom it was taken, which had been shown *prima facie* by the

evidence referred to.  The question presented is whether
proof of the facts offered was admissible, for the purpose of
showing that the person claiming to act as notary was not
a legally appointed officer, and therefore his act was void
and without jurisdiction.   The effect of the testimony offered
would have been to assail the authority of the officer who
administered the oath.   The rule is well settled that the
acts of an officer *de facto* are valid, as respects the public
and the rights of third persons, and it is not allowable to
assail the title of such officer, in a collateral proceeding.
(*Read* v. *City of Buffalo*, 3 Keyes, 447; *McInstry* v.
*Tanner*, 9 J. R., 134; *People* v. *Stevens*, 5 Hill, 616, 634;
*Greenleaf* v. *Lowd*, 4 Denio, 169; *People* v. *Hopson*, 1 id.,
574, 579; *People* v. *Collins*, 7 J. R., 549; *People* v. *Cook*,
8 N. Y., 67.)

In the *People* v. *Cook* (*supra*), it is said in the opinion
that : " A challenged voter, swearing falsely before a *de
facto* board of inspectors, is as much liable to punishment
under the statute as if the oath had been administered by
inspectors *de jure.*"   While this may be a sound rule of
law, it does not affect the question now considered, for the
reason that the inspectors, in such a case, may be lawfully
appointed or elected ; and the failing to take the oath is,
at most, an irregularity or defect, which cannot affect the
legality of their election as inspectors, in the first instance.
This is clearly distinguishable from a case where there is an
entire want of power to make the appointment.   The ques-
tion here affects the origin of the appointment, and the
right to hold the office, by virtue thereof, and is not merely
an irregularity occasioned by a failure of the officer to take
the oath required by law.   There is a wide and marked dis-
tinction between the right to act at all and the failure to
comply with some statutory requirement, in assuming power
conferred by an appointment to discharge the duties of an
official position.   So also in *Howard* v. *Sexton* (1 Denio,
440), where it was held that parties to a submission to arbi-
tration may waive the oath of the arbitrators, and that wit-

nesses, whose oath is thus waived, may commit perjury, by false swearing upon such arbitration; the question as to the original authority and jurisdiction of the court, and its power to act, did not arise.

In none of the cases cited was the distinct question presented which we are now called upon to determine. Nor does either of them relate to any question arising upon an indictment for perjury, where jurisdiction is the essential feature; and the utmost extent to which any of the authorities cited have gone, in cases of perjury, is that proof that the officer acted as such is only *prima facie* evidence of his authority.

Conceding the correctness of the rule upheld in the cases cited, and that such rule is most generally applicable, I am of the opinion that it cannot be invoked where an indictment is found for perjury and the foundation of the charge rests entirely upon the competency or the jurisdiction of the officer or tribunal before which the oath is taken. This is one of the issues presented by the indictment, in this case; and upon principle, it would seem to be quite obvious that the accused party had a right to show that there was no such officer or tribunal in existence as is alleged in the indictment. Such a rule only operates in cases where a charge of perjury is preferred, while the acts of an officer *de facto*, acting under color of authority, even if he had been illegally appointed, under ordinary circumstances would not be affected or impaired. No pernicious consequences or serious inconvenience would result to the public at large by the enforcement of such a principle, as all acknowledgments made, or other acts of a notary public or of any other officer *de facto* done, while in the performance of his duties, except in cases where false swearing was directly charged, would be valid and lawful. The argument of *ab inconvenienti* therefore has no application, and should not influence the decision of the question considered, even if it could properly be urged, to affect the disposition of a grave criminal charge, under any circumstances.

The principle stated is, we think, also upheld by sufficient authority. In *Rex* v. *Verelst* (3 Camp., 432), an indictment was found for perjury committed before one acting as surrogate in the ecclesiastical court, in making oath to an answer in a cause there pending for a divorce. The surrogate having acted in that capacity, it was held that it was *prima facie* evidence of his appointment, and that he had authority to administer the oath. It appeared, however, from the registrar's book containing the appointment, that it was irregularly made, for the reason that instead of being authenticated in the usual manner, no notary public, nor the registrar, nor his deputy, had been present at the time, for the purpose of authenticating the act, according to the rule of the ancient common law ; and it was claimed that the appointment was a nullity. In opposition to this view, it was contended by the prosecution that the officer appointed having acted for over twenty years in the capacity of surrogate, a judge and jury at *nisi prius* ought not to inquire into the manner of his appointment ; and even if they did, they might presume that an officer was present, from the entry, and the appointment might be regular, although the entry was deficient. Lord ELLENBOROUGH held that the presumption arising from the acting as surrogate only stands until the contrary is proved ; and after reviewing the facts, decided that the allegation that Dr. Parsons, who acted as surrogate, had authority to administer the oath was negatived, and the defendant was acquitted.

There is a striking analogy between the case cited and the one at bar, for in both of them the question related to the validity of the appointment ; and if it was illegal in the one case, the application of the same principle would render it equally so in the other. The case referred to is a *nisi prius* decision, but it has been cited in the elementary books approvingly, as well as in several reported cases in the courts.

In *Wilcox* v. *Smith* (5 Wend., 231, 235), a constable was sued for trespass, and justified under an execution issued by a justice of the peace, which was regular upon its face ; and

it was held that showing that the officer issuing the process was an officer *de facto* is not merely *prima facie* evidence that he is an officer *de jure*, but was conclusive for the protection of a ministerial officer required to execute such process. In commenting upon the case of *Rex* v. *Verelst* (*supra*), it is said in the opinion: "Here the act of the officer was *made the foundation of an affirmative criminal proceeding*, instead of being used as a defense or protection; and it may well be that his strict legal title to his office, under such circumstances, may be inquired into; (1 Hawk. P. C., ch. 69, § 4;) but if an officer had been prosecuted as a trespasser for an act done under a precept or warrant issued by the surrogate, I apprehend an inquiry into the title of the surrogate to his office, after an unquestioned exercise of its powers for twenty years, would not have been permitted."

In Hawkins P. C., vol. 2 [7th London ed.], p. 86, it is laid down that: "It seemeth clear that no oath whatsoever, taken before a person acting merely in a private capacity or before those who take upon them to administer oaths of a public nature without legal authority for their so doing or before those who are legally authorized to administer some kind of oaths, but not those which happen to be before them or even before those who take upon them to administer justice by virtue of an authority seemingly colorable, but in truth unwarranted and merely void, can ever amount to perjuries in the eye of the law, because they are of no manner of force, but are altogether idle." It is also said in the same section, by the same author that "no false oath in an affidavit, made before persons falsely pretending to be authorized by a court of justice to take affidavits in relation to matters depending before such court, can properly be called perjury, because no affidavit is in any way regarded, unless it be made before persons legally intrusted with power to take it," etc.

In Archb. Cr. Pl. [7th G. & B. ed.], pp. 537 and 538, it is stated, that the oath "must be taken before a competent jurisdiction. For, if it appear to have been taken before a

person who had no lawful authority to administer it; (3 Inst., 165, 166); or who had no jurisdiction of the cause; (3 Inst., 166; Yelv., 111); the defendant must be acquitted," and numerous authorities are cited to sustain this position. It follows, as a logical result of the authorities cited, that proof may be introduced for the purpose of showing a want of authority in the officer taking the oath.

In *Morrell* v. *The People* (32 Ill., 499), an indictment was found for perjury before the clerk of the Circuit Court. One of the grounds of error alleged was that there was no proof that the person who administered the oath was clerk as alleged. It was held that it was requisite that it should be proved that the person, before whom the oath was taken, was authorized by law to administer it; that proof that the person who administered the oath habitually acted in the capacity of a particular officer is perhaps only *prima facie* evidence of the fact; but until rebutted, it was sufficient, without producing his appointment or commission. This case, therefore, sustains the doctrine that the presumption from acting may be rebutted by proof to the contrary, citing *Rex* v. *Verelst* (*supra*), and other authorities. The principle stated is elementary, and I am unable to discover how it can be disregarded, without violating a well established legal rule.

It is said that the notary was an officer *de jure*, and having been regularly appointed by the proper authority, who must be presumed to have passed upon the question of his residence, it is therefore *res adjudicata*. Conceding that, as a general rule, the governor may appoint an alien, or a convicted felon, or a minor, or other person, who is disqualified from holding a civil office, to an official position, and that inquiry cannot be made as to the title to the office collaterally, there is no reason why such a doctrine should prevail, where the jurisdiction of the officer, and his power to administer an oath, is a subject of controversy and dispute, and a contest is made on that point upon the trial on an indictment for perjury. As we have seen, the power, the authority and the

right of the officer to administer the oath is the very foundation of the charge, and the basis upon which the offence rests, and hence, is a matter which must be lawfully proved. Without testimony to establish this important fact, the indictment cannot be upheld, and the whole charge must fail; and when such evidence is introduced, the right to contradict it is clear and unequivocal, and cannot be controverted by presumptions that the appointing power has performed its duty. The case of *Rex* v. *Verelst* (*supra*), which is fully sustained by other authorities, is directly in point on this question, and we think the doctrine there laid down is controlling.

In the conclusion at which I have arrived, in reference to the question last discussed, it is not intended to decide that where a public officer holds an office under a valid appointment or election, that a subsequent disability can be made the subject of inquiry, in any other manner than by a direct proceeding for that purpose, or that his acts, as an officer *de facto*, are not valid until he is lawfully declared to be disqualified. Such a case has no analogy to one where there never was any power to act, and an entire want of authority from the commencement.

There is also another ground upon which I think that the evidence offered was admissible. The evidence introduced by the prosecution was very slight, and by no means conclusive. No commission was introduced to show Mellick's appointment, and only a single witness testified that he had been in the habit of acting for some years. The book introduced from the county clerk's office did not show that he had qualified by taking the oath of office; nor was such oath produced. No evidence of the genuineness of his signature in the book was given, nor was his handwriting distinctly proven. The evidence, at most, was *prima facie;* and to rebut the presumption arising from the same, and to show the improbability of his having been appointed to such an office, it was, I think, competent to prove that he was actually a non-resident, and was entirely disqualified from

holding any such office. It was, at least, an open question as to the weight to be given to the testimony introduced by the prosecution, and the evidence offered should have been received as bearing upon that branch of the case.

There are numerous other questions in the error book of a serious character. As, however, the conviction was erroneous, upon the grounds stated, it is not important to consider them ; and for the reasons already given, the conviction and judgment must be reversed and a new trial granted.

EARL, J. I concur in the result reached by Judge MILLER, and favor a reversal of the judgment upon three grounds.

1st. It was necessary for the People to show that the oath alleged to be false, was taken before either a *de jure,* or a *de facto* notary. The only proof given was that Mellick, who administered the oath, had acted as a notary for some years. This was *prima facie* evidence that he was a *de jure* notary. The defendant had the right to meet this *prima facie* case by any evidence tending to show that he was not *de jure* a notary, and the evidence offered to show that Mellick, at the time of his alleged appointment, and subsequently to the time he administered the oath, was a resident of New Jersey, had such tendency. If true, it would have shown that he was a person who could not have been legally appointed, and hence would have destroyed the presumption that he had actually been appointed. There could be no presumption that the governor appointed one to the office of notary whom he had no legal right to appoint. If this evidence had therefore been received and uncontradicted, it would have been necessary then for the People to show that Mellick was a notary *de facto.* This could not have been shown by evidence that he had merely acted as such. The *de facto* character of officers is never established by simple proof that they have acted as such. In addition to such proof, it must be shown that they had color of office, or some semblance of competent authority. This is generally shown by proof of

some election or appointment, formal, but irregular or defective, under which the officer has assumed to act. I am not, however, prepared to deny that an officer may have sufficient color, in some cases, without any appointment or election whatever ; as when he takes possession of the public building or room where the duties are to be discharged, and has possession of the public property pertaining to the office, and is thus clothed with all the *indicia* of official position, and has for a considerable time, with the acquiescence of the public, and without dispute, openly and notoriously exercised the duties of the office. Such a case could rarely, if ever occur in this country ; but if it should occur, it might give color of office. To illustrate more clearly my meaning ; if one should take possession of a county clerk's office, claiming to be clerk, and should there act as clerk for a considerable time, by the general acquiescence of the public, there being no one else to exercise the duties of the office, he might have sufficient color of office to make him clerk *de facto*. But a notary public having no public office, clothed with none of the symbols or outward tokens of official position, being one of thousands who may, any where in the same county, exercise the duties of the same office, cannot get color of office by simply acting from time to time as he might have opportunity. He can get color of office only by an appointment emanating from the appointing power, or from some power having, at least, a colorable right to make the appointment. If the governor should commission him, without confirmation by the Senate, or while he was a nonresident, and he should then act, he would be in office under color of appointment, and thus become a notary *de facto*. These views are abundantly sustained by the authorities in this State. (*The People* v. *Collins*, 7 J. R., 549; *Wilcox* v. *Smith*, 5 Wend., 231; *Ring* v. *Grout*, 7 id., 341; *People* v. *White*, 24 id., 520; *Hamlin* v. *Dingman*, 5 Lans., 61 ; *People* v. *Cook*, 14 Barb., 259; S. C., 8 N. Y., 67.) There was, therefore, error in the exclusion of the evidence as to the residence of the notary

2. For reasons stated fully by Judge MILLER, there was error in the admission of the evidence of the witness McCall, as to the declarations of Reed.

3. It is conceded that there could be no conviction under this indictment, if the words "according to the best of their information, knowledge and belief" applied to the whole affidavit. I think they do so apply, and concur generally with what Judge MILLER says upon this point. The question is not how the affidavit may be made to read, by a critical and strictly grammatical construction, but how it would be commonly understood. We are to construe this as we think mankind generally would understand it. Such qualifying words in brief affidavits are usually put at the end, and are usually intended to qualify the whole affidavit. So far as I can perceive, there was just as much reason for qualifying the whole as the part immediately preceding the qualifying words. But if the legal construction of this affidavit is in doubt, the prisoner is entitled to the benefit of such doubt. It is a humane principle of the law that a prisoner shall have the benefit, not only of doubts upon the facts, but doubts also upon the law.

I concur, therefore, in the reversal of the judgment.

HAND, J. I agree in the result of Judge MILLER's opinion, that there should be reversal of conviction and new trial in this case. I cannot, however, concur in all the grounds stated by him; and as the fate of any new trial may be dependent upon some of them, it is proper that the views of the court should be expressed upon these questions.

1st. I think the language of the affidavit, in its proper and natural construction, and according to grammatical rules, is a positive affirmation as to the prisoner's being an officer of the company, and the "above named assets" being the absolute property of the company. Of course, this does not, in the least degree, prevent an acquittal of the prisoner, if the jury find that he did not intend, in fact, to swear positively, but only upon information and belief as to

these matters. Hence the observations of the opinion as
to harsh consequences from *such a* construction I do not
think just or well founded. The question presented here
really is, whether the proof of the making of that affidavit
was admissible at all, as within the indictment charging a
positive oath. In other words, whether the first part of the
affidavit *could* fairly be construed to be a positive affirmation,
and must not necessarily be held to be an affirmation on
information and belief, as a question of grammatical con-
struction. That technical question of grammar is raised,
therefore, not by the prosecution, but by the prisoner. As
already stated, I think it could be so construed, and, indeed,
that no other construction is strictly grammatical; and
hence, that there was no error in the court below, in not
holding that the whole affidavit was necessarily upon infor-
mation and belief. I disagree with the opinion, therefore,
upon this point.

2d. I agree with the opinion that there was error in the
admission of evidence of Reed's statements, to the extent
they were allowed.

3d. I also agree that the evidence as to the notary's resi-
dence was, under the circumstances, improperly excluded. I
am not prepared to assent to the doctrine of the opinion that
perjury can only be committed before an officer *de jure*, and
that, on the trial of an indictment for that crime, the title
of such officer can always be attacked. Nor, indeed, am I
prepared now to say that if, in the present case, the com-
mission of the notary from the proper appointing power had
been shown, that the prisoner could have raised such a ques-
tion as non-residence. I am inclined to think that, in such
a contingency, the question of residence being often a very
nice one, the validity of the appointment could not thus be
attacked. But here there was hardly any proof that the
party who took the affidavit was a notary at all. The list
in the clerk's office proved absolutely nothing; and, indeed,
I do not see how it was admissible. The mere fact that he
assumed to act as a notary was all the proof really given of

his official position. It is doubtful, to my mind, whether this was any proof of even color of office. But if it be conceded that it tended in some degree to show a *de facto* officer, or to raise a presumption or inference that he had been appointed, I think proof that the person was a non-resident, and therefore incapable of holding that position, was admissible, to rebut any such presumption *that he had ever been appointed,* and was anything but a mere intruder. Of course, if legal proof, of any sort, of an appointment had been made, there would be no longer any room for presumption upon this point, and nothing of that sort which could be rebutted ; but not so, as the case now stands.

All concur with MILLER, J., as to admission of the declarations of Reed. CHURCH, Ch. J., concurs with MILLER, J., as to rejection of evidence of non-residence of notary.

FOLGER, J., concurs with HAND, J., as to notary. RAPALLO, J., concurs with HAND, J., as to construction of affidavit, and with EARL, J., as to notary.

ANDREWS, J., concurs with MILLER, J., as to construction of affidavit.

Judgment reversed.