PEOPLE ex rel. HEGEMAN v. CORRIGAN, City Magistrate, et al.

(Supreme Court, Appellate Division, First Department. December 11, 1908.)

1. CRIMINAL LAW (§ 212*)—PRELIMINARY WARRANT.

To justify a magistrate in issuing a warrant of arrest under the authority conferred by Code Cr. Proc. §§ 148–150, it must appear from the depositions of the prosecutor and his witnesses that a crime has been committed, and that there is reasonable ground to believe that the defendant committed it.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 443; Dec. Dig. § 212.*]

2. HABEAS CORPUS (§ 102*)—NATURE AND GROUNDS.

Under the express provisions of Code Civ. Proc. § 2031, it is the duty of the court before whom a prisoner is brought on a writ of habeas corpus to discharge the prisoner if it appears that the depositions upon which the warrant for his arrest was issued do not tend to establish the commission of a crime.

[Ed. Note.—For other cases, see Habeas Corpus, Cent. Dig. §§ 87, 88; Dec. Dig. § 102.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. PLEDGES (§ 40*)—DISPOSITION OF PLEDGE.

On the breach of an agreement to sell and repurchase loans and collaterals transferred by a pledgee to one who paid the amount of the loans, the party in default will not be liable except for the damages sustained.

[Ed. Note.—For other cases, see Pledges, Dec. Dig. § ‘40.*]

4. SALES (§ 205*)—OPERATION AND EFFECT—TRANSFER OF TITLE AS BETWEEN PARTIES.

A sale coupled with an agreement to repurchase at a future time passes legal title of the property to the purchaser.

[Ed. Note.—For other cases, see Sales, Dec. Dig. § 205.*]

5. PERJURY (§ 12*)—FALSITY OF TESTIMONY.

To sustain a charge of perjury as defined by Pen. Code, § 96, it must appear that the accused deposed falsely.

[Ed. Note —For other cases, see Perjury, Cent. Dig. §§ 55, 56; Dec. Dig. § 12.*]

6. PERJURY (§ 12*)—OFFENSES.

Where loans, and collaterals held to secure them, were transferred by an insurance company to its bankers on the day before it made its annual report to the Superintendent of Insurance, the amount of such loans being paid to the company and the loans and collaterals delivered to the bankers, the company ceased to be the holder thereof, although it agreed to repay the amount received with interest and take back and ·reinstate the loans immediately after the filing of its annual report, according to a practice adopted for many years, and, therefore, a statement in such report that it held no loans on the day the report was made was true, and a verification thereof was not perjury.

[Ed. Note.—For other cases, see Perjury, Cent. Dig. §§ 55, 56; Dec. Dig. § 12.*]

·　Patterson, P. J., and Clarke, J., dissenting in part.

Appeal from Special Term, New York County.

Application by the People, on the relation of John R. Hegeman, for a writ of habeas corpus against Joseph E. Corrigan, city magistrate, and Peter Beery, a peace officer. From an order dismissing the writ, the relator appeals. Reversed.

Argued before PATTERSON, P. J., and INGRAHAM, McLAUGHLIN, CLARKE, and HOUGHTON, JJ.

Morgan J. O'Brien, for appellant.
Robert C. Taylor, for respondents.

INGRAHAM, J. On the 20th day of February, 1908, the district attorney of the county of New York submitted to a city magistrate depositions charging the relator with the crime of perjury. Upon these depositions the magistrate issued a warrant for the arrest of the relator on that charge, and delivered the same to the defendant Beery, a police officer, who thereupon arrested the relator; whereupon the relator sued out a writ of habeas corpus requiring the defendant· Beery to produce the person of the relator before a Special Term of the Supreme Court. At the same time there was issued a writ of certiorari commanding the city magistrate to return to the Supreme Court the date and cause of the imprisonment of the relator, and in the return to this writ of certiorari the magistrate returned the depositions upon which he had issued the warrant. In the hearing before the Supreme

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Court the relator claimed that these depositions failed to show that any crime had been committed, and that the city magistrate was not, therefore, authorized to issue the warrant, and the officer had no authority to hold the relator under it. The Special Term overruled this contention, and remanded the prisoner to custody, and from the order entered thereon the relator appeals.

Section 148 of the Code of Criminal Procedure provides that when an information is laid before a magistrate of the commission of a crime he must examine the informant or prosecutor and any witnesses he may produce, take their depositions in writing, and cause them to be subscribed by the parties making them. Section 149 provides that the deposition must set forth the facts stated by the prosecutor and his witnesses tending to establish the commission of the crime and the guilt of the defendant. Section 150 provides that if the magistrate be satisfied therefrom that the crime complained of has been committed, and that there is reasonable ground to believe that the defendant has committed it, he may issue a warrant of arrest. To justify the magistrate in issuing the warrant, therefore, it must appear from the depositions of the prosecutor and his witnesses taken before him that a crime had been committed, and that there is reasonable ground to believe that the defendant has committed it. Section 2015 of the Code of Civil Procedure provides that:

"A person imprisoned or restrained in his liberty, within the state, for any cause or upon any pretence, is entitled * * * to a writ of habeas corpus, or a writ of certiorari, as prescribed in this article, for the purpose of inquiring into the cause of the imprisonment or restraint, and, in a case prescribed by law, of delivering him therefrom."

Section 2031 of the Code of Civil Procedure provides that:

"The court or judge before which or whom a prisoner is brought by virtue of a writ of habeas corpus, issued as prescribed in this article, must, immediately after the return of the writ, examine into the facts alleged in the return, and into the cause of the imprisonment or restraint of the prisoner; and must make a final order to discharge him therefrom, if no lawful cause for the imprisonment or restraint or for the continuance thereof is shown; whether the same was upon a commitment for an actual or supposed criminal matter or for some other cause."

If, therefore, it appeared that the depositions upon which the magistrate issued the warrant did not tend to establish the commission of a crime, it was the duty of the court before whom the person was brought to sustain the writ and discharge the prisoner; and, necessarily, the fundamental question presented on this appeal is whether, upon the depositions presented to the magistrate, there was proof that a crime had been committed.

The crime charged against the relator was that of perjury in the verification of a report made by the Metropolitan Life Insurance Company to the Superintendent of Insurance in the state of New York in January, 1905. The Metropolitan Life Insurance Company was originally incorporated on January 2, 1866, under the name of the National Travellers' Insurance Company, with a capital of $200,000. Its charter was amended by chapter 286, p. 539, of the Laws of 1867; chapter 49, p. 58, of the Laws of 1868, when the name of the corpora-

tion was changed to the. Metropolitan Life Insurance Company; chapter 87, p. 102, of the Laws of 1874; chapter 437, p. 617, of the Laws of 1883; and chapter 492, page 1022, of the Laws of 1892. On the 28th of January, 1905, there was filed in the office of the insurance department of the state of New York the annual statement of the Metropolitan Life Insurance Company for the year ending December 31, 1904, in pursuance of the provisions of the insurance law of this state, and was made upon blanks furnished by the insurance department to the Metropolitan Life Insurance Company. It contains a statement of the capital stock of the company, its income and disbursements for the year, with a detailed statement of the assets of the company. The statement of the assets consists of what are called "Ledger Assets" and "Non-Ledger Assets." In the schedule of ledger assets there was inserted, in the blanks furnished by the insurance department: "3. Loans secured by pledge of bonds, stocks or other collateral, per Schedule C"; the company to insert in this blank the amount of such loans; and there is inserted opposite this item the figure "0." In the non-ledger assets there is inserted an item: "13. Interest due, $———— and accrued, $———— on Collateral Loans." After the dollar marks there is inserted the figure "0," and carried out at the end also a figure "0." There is here clearly indicated that the company carried no loans secured by a pledge of bonds, stocks, or other collateral, and that there was no interest due on collateral loans. Annexed to this report there was an affidavit of the president and secretary of the company, as follows:

"State of New York, County of New York—ss.: John R. Hegeman, President, and James S. Roberts, Secretary, of the Metropolitan Life Insurance Company, being duly sworn, each for himself deposes and says that they are the above described officers of said company, and that on the thirty-first day of December last all the above described assets were the absolute property of the said company, free and clear from any liens or claims thereon except as above stated; and that the foregoing statement, with the schedules and explanations herein contained, annexed or referred to, are a full and correct exhibit of all the assets, liabilities, income and disbursements and of the condition and affairs of the said company on the said thirty-first day of December last, and for the year ending on that day, as the same were in fact and as the same are shown by the books of the company, and that the foregoing declarations and answers are true, according to the best of their information, knowledge and belief, respectively."

This was signed by the relator and the secretary of the company and sworn to before a notary public.

The crime charged in the deposition taken before the magistrate was that the relator had committed the crime of perjury, under the following circumstances: That the Metropolitan Life Insurance Company was, subject to the provisions of the insurance law, required annually on the 1st day of January, or within two months thereafter, to file in the office of the Superintendent of Insurance a statement, verified by the oath of at least two of the principal officers of the said corporation, showing its condition on the 31st of December then next preceding; that such statement should be in such form and should contain such matters as the superintendent should prescribe; that on the 26th day of January, 1905, the relator personally appeared before a notary pub-

lic, produced before him a certain statement in writing purporting to be the annual statement of the Metropolitan Life Insurance Company so required by law to be made, and which such statement purported to be a true statement of the condition of the Metropolitan Life Insurance Company on the 31st of December, 1904; that the said statement contained the following item: "3. Loans secured by pledge of bonds, stocks or other collateral, per Schedule C,—0"; by which said item in said statement it was then and there made to appear, and the said item purported to indicate and set forth, and did in substance and effect then and there signify and declare, that on the 31st of December, 1904, there was owed to the Metropolitan Life Insurance Company no money whatever because of any loans theretofore made by the said Metropolitan Life Insurance Company upon the pledge with it of any bonds, stocks, or other collateral—

"whereas, in truth and in fact, the statements contained in the said annual statement, and more particularly in the said schedule headed 'IV.—Ledger Assets,' were not true, as the said John R. Hegeman then and there well knew, in that on the said 31st day of December, 1904, there was owing to the Metropolitan Life Insurance Company the sum of $1,492,875 because of loans theretofore made by the said Metropolitan Life Insurance Company to various persons, firms and individuals, upon the pledge by said persons, firms and individuals with the said Metropolitan Life Insurance Company of certain bonds, stocks and other collateral, as will more fully appear from the affidavits of Henry W. George, Frederick H. Ecker and William A. Read, hereto annexed and made part hereof."

The charge is thus based upon the falsity of this statement that there was owed to the Metropolitan Life Insurance Company no moneys because of loans made by the said Metropolitan Life Insurance Company upon the pledge with it of bonds, stocks, or other collaterals. If, therefore, as a fact, on the 31st day of December, 1904, it did not appear from the depositions submitted that there was due to the Metropolitan Life Insurance Company any amount because of such loans, it is quite evident that there was no evidence before the magistrate that a crime had been committed, and the magistrate was not, therefore, under the provisions of the Code of Criminal Procedure to which attention has been called, authorized to issue a warrant for the arrest of the relator. And as the depositions upon which the magistrate had acted were before the court for review under the writ of certiorari, the relator was entitled to have that question determined.

In the depositions taken before the magistrate it appeared that for upwards of 15 years it had been the policy of the Metropolitan Life Insurance Company not to make any return of loans made upon the pledge with it of bonds, stocks, or other collaterals. In order to enable the officers of the company to make a truthful report without showing that the insurance company had made any such loans, it had been the custom of the company to transfer all of these loans it had made to the firm of Vermilye & Co., a firm of bankers doing business in the city of New York, against whose responsibility no suggestion is made. Vermilye & Co. were bankers of the insurance company, having a deposit account with them, and this firm transacted its business in relation to the purchase and sale of securities. On the 30th of December in each year during which this custom had been in vogue,

the insurance company had sent to Vermilye & Co. the collaterals which it held to secure the payment of any loans that were in force at that time, and received from Vermilye & Co. a check for the amount due on such loans. Immediately after the 1st of January in each year the insurance.company was in the habit of returning to Vermilye & Co. a check for the amount secured by these loans, with interest on the amount paid by Vermilye & Co. to the insurance company for the period named, and receiving back from them the collateral that had been held to secure the repayment of the loans, when the loans would be reinstated. These payments were entered in the books of the insurance.company as showing a payment of the loan, so that on the books of the company on the 31st of December in each year it would appear that the company carried no loans secured by collaterals of the character mentioned. When the loans were reinstated after the 1st of January, proper entries were made to show that the life insurance company then carried the loans. There was submitted to the magistrate a deposition of Mr. Read, a member of the firm of Vermilye & Co., who deposed that what was known as the year-end transfers of loans and syndicate participations of the Metropolitan Life Insurance Company to Vermilye & Co. had been going on for something over 15 years; that they were commenced when the relator said that he desired to get certain loans off the books and wanted to know if Vermilye & Co. would take them over the end of the year; that Mr. Read said that they would, and the relator sent them down; that, as explaining this desire, the relator stated that the insurance company was not a loaning company, and if they showed loans on their books they would be pestered to death by Wall Street houses asking the company to make loans, and that he did not care to do that business; that, therefore, when they were asked to make such loans, they could show the annual statement of the company which indicated that the company did not loan money on collaterals; that in all these transactions the understanding between Vermilye & Co. and the relator, as president of the insurance company, was that, immediately after the period to which the company's statement to the Superintendent of Insurance related, these loans and syndicate participations would be resold to the Metropolitan Company, and meanwhile the Metropolitan Company was to pay interest to Vermilye & Co.; that, in pursuance of these agreements, Vermilye & Co. gave to the Metropolitan Life Insurance Company their check, and bought the loans and syndicate transactions outright; that there was no talk with the relator in that year, but that that year's transactions as well as the others were carried through in accordance with the original understanding. There was also a letter produced to Mr. Read, signed by the relator, relating to the transaction for December, 1902, dated on December 30th, which stated that on the next day the company would send to Vermilye & Co. syndicate papers "as heretofore advised in detail, and receive from you check for $1,401,943.25; that the company would also send a check at the same time on deposit account for $600,000." "On January 2nd, 1903, we will reverse this, sending you our check for $1,401,943.25 and drawing on deposit account for $600,000. Whatever interest may be involved in this, please make us an account of

after the transactions are over." And on January 2, 1903, the rela-
tor wrote Vermilye & Co. as follows:

"Gentlemen: Enclosed herewith find cheque to your order for $1,401,-
943.25, for which please return us by bearer the Syndicate papers deposited
with you on the 30th ultimo."

Similar correspondence passed between the company and the relator
in relation to this transaction for December, 1903, and January, 1904.
On December 30, 1904, the relator wrote to Vermilye & Co., inclosing
a check for $750,000 to be placed to the credit of the company's de-
posit account, and adding:

"For the accompanying package please send us your $1,492,875. We will
reverse this transaction according to understanding, on Tuesday, January
3rd, 1905."

And on January 3, 1905, the insurance company sent its check for
the same amount to Vermilye & Co. with a request that Vermilye &
Co. return by bearer the securities delivered to them on December
31st. Vermilye & Co. thereupon returned the securities received by
them to the relator, and at the same time submitted a statement of the
charge for interest from December 30th to January 3d, amounting to
$497.63, which the insurance company paid.

It was claimed by the learned district attorney, as the basis of his
charge, that the statement verified by the relator was false; that, not-
withstanding this transaction, the insurance company never ceased to
be the holder of these loans secured by these collaterals; and that
therefore the statement made in the return to the insurance department
that it held no loans secured by the collaterals mentioned was a false
statement, and the affidavit verifying this as a true statement was per-
jury. It is undoubtedly true that neither the insurance company nor
Vermilye & Co. expected this transaction to result in a permanent
transfer by the insurance company to Vermilye & Co. of these loans.
It might be that, as between the persons borrowing this money and
the insurance company, such a transaction could be regarded as a con-
version of the securities held to secure the loan; but it is apparent that
there was an actual completed transaction by which the insurance
company had transferred the loans and the collateral held to secure
them to Vermilye & Co., and had received from Vermilye & Co. the
amount due to the insurance company thereon. Thus the relation of
the insurance company to the borrowers had changed. It did not hold
the loans secured by the collaterals, for it had received the amount
that it had loaned, and Vermilye & Co. then became the creditor and
had in their possession the securities pledged to secure the loans. It
does not appear that Vermilye & Co. were under any obligation to re-
turn these loans to the insurance company; but undoubtedly that re-
turn was contemplated by both parties to the transaction, and if either
party had refused to carry out this contemplated transaction in Jan-
uary I do not see that the party in default would have been liable ex-
cept for the damages sustained. Wheeler v. Allen, 51 N. Y. 37; Nat.
Bank v. Rogers, 1 App. Div. 623, 37 N. Y. Supp. 365. A payment by
the debtors to Vermilye & Co. would have discharged the loans, and
a payment of the amount due to the insurance company by a debtor

having knowledge of the actual transaction would not have discharged the loan and released the securities held by Vermilye & Co. The insurance company actually had in its possession the money that it had loaned, and could have claimed nothing more from either the debtors or Vermilye & Co. Thus, considering the rights of the parties, as this transaction stood on the 31st of December, the insurance company no more had money actually loaned upon the pledge of these securities mentioned than if the debtors themselves had paid off the loans and received back their securities with an agreement that the insurance company would subsequently renew the loans. And thus, it seems to me, it was a true statement that was inserted in this report to the Superintendent of Insurance. The contract or promise of the insurance company to repay to Vermilye & Co. the amount that it had paid on the 30th of December may have been an obligation or an agreement to make a loan in the future, but there was nothing in the existence of such an agreement that made this statement that on the 31st of December it had no loans secured by a pledge of bonds, stocks, or other collaterals a false statement, swearing to which would subject the deponent to prosecution for perjury. The basis of the claim of the district attorney is that, if the company in making the transfer made a simultaneous agreement to take back the loan, it never parted with the title of the loan in good faith. It has never been claimed, so far as I know, that a sale of property coupled with an agreement to repurchase at a future time did not actually transfer the legal title; and it seems to me clear that, whatever can be said of this transaction, it cannot be said that on the 31st of December, 1904, this insurance company had these loans secured by collaterals outstanding, when as a fact it had in its possession on that day the money that it had loaned, and had delivered to the person who had paid the money the collaterals to secure the loans. The statement called for by the insurance department was of the actual condition of the company on the 31st of December, 1904. The officers of this company had knowledge of the fact that the company was required to make a statement of the condition on that day. If the insurance department had desired information as to the method of transacting business during the year, or the amount of loans the company had made during the year, it could easily have required a statement containing such information; but no such statement was required, and no such statement was attempted to be made. What the department required of the company was a statement of its condition on December 31, 1904, and that statement it obtained.

From the facts as they appeared before the magistrate, there can be no question but that the relator honestly believed he was making a true statement of the actual condition of the company on the 31st of December, 1904, and as an actual fact the statement that was made and that the relator verified was a true statement. Perjury is defined by section 96 of the Penal Code to be:

"A person who swears or affirms * * * that any testimony, declaration, deposition, certificate, affidavit or other writing by him subscribed is true, * * * on any occasion in which an oath is required by law * * * willfully and knowingly testifies, declares, deposes or certifies falsely, in

any material matter, or states in his testimony, declaration, deposition, affidavit or certificate, any material matter to be true which he knows to be false, is guilty of perjury."

To sustain that charge, therefore, it must appear that the relator deposed falsely. If, as a matter of fact, the statement contained in the report was true, he did not depose falsely; and it would appear that upon the undisputed evidence the statement contained in the report was true, and, therefore, it would seem to follow that the crime of perjury was not committed. It is not necessary that we should characterize the acts of the relator in carrying through this transaction. It had been a practice adopted for many years, and while the effect of it was to deceive the insurance department, it certainly does not appear that the company did lose, or could lose, assuming the responsibility of Vermilye & Co., anything by the transaction. Whatever the motive may have been, and whatever offense such a transaction may involve, all that we have to do upon this appeal is to determine whether or not, upon these depositions submitted to the magistrate, there was evidence that the crime charged had been committed. As it seems that the statement that was made was actually true, it must follow that the relator cannot be held for perjury in swearing to it; and as the depositions before the magistrate, instead of proving that the crime of perjury had been committed, quite conclusively proved that that crime had not been committed, he was not justified in issuing the warrant.

It follows that the order appealed from must be reversed and the relator discharged.

McLAUGHLIN and HOUGHTON, JJ., concur.

PATTERSON, P. J. I concur in the reversal of the order dismissing the writs of habeas corpus and certiorari and remanding the relator to the custody of the respondent Beery, but I am not convinced that the principal reason for a reversal assigned in the opinion of Mr. Justice INGRAHAM should control. I do not think it is established by the affidavits upon which Mr. Corrigan, the city magistrate, acted in issuing his warrant, or that the evidence which was presented to him shows that as matter of fact there was an out and out sale of the securities by Mr. Hegeman to Read & Co. I am unable to adopt the conclusion that as matter of law the year-end transactions of 1904, by which the loans of the Metropolitan Life Insurance Company and the collaterals to secure such loans were turned over to Read & Co., constituted an actual sale.

Notwithstanding that situation, it seems to me that the affidavits and evidence before the city magistrate were not sufficient to establish prima facie the charge of perjury made against Mr. Hegeman. The affidavit annexed to the annual statement for the year ending December 31, 1904, and which was verified by Mr. Hegeman, was made upon information and belief, as is alleged in the deposition of Flood, who preferred the charge. The charge is:

"That the said John R. Hegeman, in the county of New York, on the 26th day of January, 1905, in the manner and form aforesaid, feloniously, willfully, knowingly, falsely, and corruptly committed perjury. * * *"

In order to establish a charge of perjury based upon such an affidavit, it should be made to appear not only that the affidavit contained a false statement, but that the accused person knew the statement to be false; and, on the trial of an indictment for perjury based upon such an affidavit, a conviction could not be had unless the indictment should negative not only the truth of the oath, but also the information and belief. Lambert v. People, 76 N. Y. 220, 32 Am. Rep. 293.

It is established by affidavits that the transaction was of a similar character to others which had been had for 14 previous years, and that it was regarded by the officers of the insurance company and by the transferees of the loans and securities as being an actual sale. The essential requirement to constitute the offense of perjury is that the inculpated party must knowingly and willfully testify or depose to a falsehood. If he believes the fact to be true, although it may be false, he certainly is not guilty of the crime of perjury; and here, it seems to me, the evidence before the city magistrate and upon which he should have acted shows that Mr. Hegeman really believed that, by making the transaction with the firm of Read & Co., there was a bona fide disposition of the loan accounts and of the securities made in accordance with a custom of his company which had obtained for many years and which was not intended to deceive or misrepresent, but merely to save the company from the importunity of borrowing brokers.

I am of the opinion that the evidence was insufficient to establish prima facie willful and deliberate perjury of Mr. Hegeman. On the contrary, there was enough to show satisfactorily that such willful and deliberate perjury had not been committed. I fully concur in the expression of Mr. Justice INGRAHAM in his opinion that, "from the facts as they appeared before the magistrate, there can be no question but that the relator honestly believed he was making a true statement of the actual condition of the company on the 31st of December, 1904." Therefore, I concur in a reversal of the order.

CLARKE, J., concurs.