## HERSH et al. v. UNITED STATES.
### No. 7092.

Circuit Court of Appeals, Ninth Circuit.

Jan. 29, 1934.

Marshall B. Woodworth, Russell P. Tyler, Reed M. Clarke, and Leon M. Shimoff, all of San Francisco, Cal., for appellants.

H. H. McPike, U. S. Atty., and R. B. Mc-Millan, Asst. U. S. Atty., both of San Francisco, Cal., for the United States.

Before WILBUR, SAWTELLE, and GARRECHT, Circuit Judges.

WILBUR, Circuit Judge.

David Hersh filed a petition in voluntary bankruptcy on July 11, 1930, and was adjudged a bankrupt on October 8, 1930. The trustee in bankruptcy qualified October 21, 1930. The bankrupt was subsequently indicted, together with his attorney, William Klein, and his bookkeeper, Auerbach, on several charges contained in two indictments, of concealing property from the trustee in bankruptcy, and conspiracy to conceal property frrom the trustee in bankruptcy. In the three counts contained in one indictment the three defendants were joined and in the two counts of the other indictment on which trial was had the bankrupt and his attorney were the sole defendants. The indictments were consolidated for trial over the objection of the defendants. The defendant Auerbach was acquitted; the appellants were convicted on all three counts of the indictment in which Auerbach was joined, and acquitted on one of the two counts of the second indictment. The first two counts on which the defendants were convicted on the first indictment charged the concealing of sums of $4,484.20 and $498.53, respectively, and the third count charged conspiracy to conceal property from the trustee in bankruptcy. The count on which the appellants were convicted in the indictment in which they alone were the defendants charged concealing the sum of $6,451.55.

In order to understand the force of the appellants' contentions on this appeal, it will be necessary to state the facts somewhat in detail.

The appellant Hersh was engaged in the retail millinery and "ready to wear" business in the city of San Francisco, with a stock of merchandise inventoried at about $38,000. He was in financial difficulty and in June, 1930, called a meeting of his creditors for the purpose of discussing his financial condition with a view of making some sort of an arrangement for payment of his debts. At this meeting a desire was expressed on the part of Hersh to pay his creditors in full, but some of his creditors doubted his ability to do so. On June 25, 1930, another meeting of his creditors was called, at which meeting Hersh submitted a proposal for a compromise under the terms of which he would pay to the creditors a sum equivalent to 30 cents on the dollar and receive a discharge. He proposed to make the payment of 30 cents on the dollar from funds raised by him, in part by borrowing about $6,500 on his life insurance, in part by a second mortgage on a house and lot used as a home and owned by or standing in the name of his wife, and in part by loans from friends. Some of the money thus proposed to be raised by the bankrupt would not be available to creditors in the event of bankruptcy proceedings. Under the law of California, life insurance is exempt from execution if the annual premiums do not exceed $500, and, if the premiums do exceed $500, the exemption is equal to the proportion of the whole which $500 bears to the whole annual premium paid (section 690 Cal. Code of Civ. Procedure, subd. 18, as amended in 1903, Cal. Stat. 1903, p. 114). It is sufficient for the purpose of this appeal to note that the proposal to apply exempt property and borrowed money to the discharge of his debt was a valid consideration moving from the bankrupt to the creditors for his discharge by part payment if they accepted his proposal. Because of the large number of creditors, a creditors' committee was appointed and had several conferences with appellants in regard to the compromise. Attorney Dinkelspiel, representing many of the creditors,

was appointed chairman of this committee representing all the creditors. All the members of the creditors' committee were favorably disposed to the proposed settlement and agreed to recommend its acceptance but were of opinion that a voluntary petition in bankruptcy should first be filed as it would be easier to effect a compromise in bankruptcy, where only 51 per cent. of the body of creditors is required to effect a compromise, rather than to circularize the large body of creditors to obtain the signature of every one concerned. It was feared that there might be objecting creditors who might endeavor to block the proposed settlement by an attempt to enforce their rights by attachment action or otherwise. Consequently, it was agreed to by the creditors' committee and by the bankrupt that the deposits of the bankrupt in the bank should be transferred to defendant Auerbach and continued by him in his name as depositor, and that the business should be carried on upon a cash basis. Pursuant to this agreed plan two accounts were opened in the name of Auerbach, one termed "Special" opened June 23, 1930, and the other termed "Special A" opened July 3, 1930. On July 11, 1930, the date of the filing of the petition in bankruptcy, there were balances in these two accounts of $4,484.20 and $498.53, respectively, the amounts alleged in the first two counts of the first indictment to have been concealed from the trustee. In the meantime the bankrupt had perfected his arrangements for borrowing money on his life insurance policies and had received therefrom the total sum of $6,451.55 as follows: On July 3, 1930, $1,387.30, $404.79, $653.54, $2,025.84, and $330.23; and on July 7, 1930, $1,649.85. These amounts were evidenced by drafts issued by the respective life insurance companies to the bankrupt, indorsed to appellant William Klein, and deposited by him on July 10, 1930, in his personal account in the Crocker First National Bank in San Francisco. The annual premium on these policies was about $1,300.15 and the portion of the money borrowed that was exempt would be about $2,500. Shortly thereafter, on July 11, 1930, voluntary bankruptcy proceedings were inaugurated by the bankrupt for the purpose of having the court ratify the proposed composition of the creditors. In reporting the assets of the bankrupt, the sums of money which were on deposit in the Auerbach "Special" and "Special A" accounts, and the sum which had been turned over by the bankrupt to his attorney were not included in the schedules. Appellant Klein testified that the schedules were prepared several days before the petition was verified and filed. The bankruptcy petition thus concealed the fact that the bankrupt owned these several sums. On the other hand it is claimed by the appellants that all the creditors were present at the first meeting and through their committee consented to the arrangement by which the bank deposits were transferred to Auerbach. As to the $6,451.55 deposited by appellant Klein being proceeds from the life insurance policies, the schedules disclosed the ownership and the amount of the policies, and thus gave information which if followed up would have disclosed the fact that the above-mentioned sum had been borrowed thereon. The creditors knew that the bankrupt proposed to borrow money on his policies for the cash payment which was to be the consideration for the settlement which was imminent. After the filing of the petition, the bankrupt, with the knowledge of the creditors' committee, continued to conduct the business from July 11 to October 21, 1930, when the trustee in bankruptcy took possession. During this period Klein deposited $14,282.48 in his bank account in addition to the $6,451.55 received from the bankrupt on July 10, 1930. His bank balance on July 10, 1930, before the deposit of said sum of $6,451.55 was $33.84, and on October 21st was $794.40. Appellant Klein testified that between July 10, 1930, and October 21, 1930, he had returned the entire amount of $6,451.55 to the bankrupt on his demand therefor. Auerbach testified that the "Special A" account of $498.53 was augmented by deposits of $3,659.02 derived from the business, and that all of this money was drawn out by checks issued by him on the directions of the bankrupt or upon blank checks signed by him and filled in by the bankrupt. The balance in this account on October 6, 1930, was $28.43, which was then transferred to the "Special" account. One item of these expenditures was for $1,250 paid to appellant Klein as attorney's fees. The balance in this account amounted to $2,431 on August 21, 1930, before any sums were withdrawn. The account designated as Auerbach "Special" opened by the deposit of $144.84 on June 23, 1930, derived from the bankrupt, was increased by deposits derived from the business until the balance amounted to $4,484.20 at the time the bankruptcy petition was filed, this being the exact amount charged in the indictment to have been concealed by the bankrupt and his codefendants. This "Special" account was increased by other deposits derived from the business so that the total amount that had been deposited therein aggregated $23,550.40 on October 21, 1930,

when the trustee in bankruptcy was appointed. The balance in this account on that date was $194.78. On October 22, 1930, the balance was $89.43. The balance on November 3, 1930, was $26.73, which was drawn out November 5, 1930, and turned over to the trustee in February, 1931. These figures were established by the books of the banks carrying the accounts.

In April, 1931, turnover proceedings were inaugurated by the trustee in bankruptcy. During the hearings before the referee in bankruptcy both defendant Klein and defendant Auerbach were examined by the trustee and freely admitted the making of the aforementioned deposits, but testified in effect that the moneys in these deposits had all been expended in the conduct of the business of the bankrupt between the date of the filing of the petition and the date of the qualifying of the trustee. Klein and Auerbach testified at their trial, as they had before the referee in bankruptcy, that the moneys had been deposited with them as herein stated, but that all this money had been checked out upon the orders of defendant Hersh or paid directly to him, and that they believed that the money was used by the bankrupt in the conduct of the business by him before the trustee was appointed. Appellant Klein testified that he believed that appellant Hersh had a right to use the moneys belonging to him in the conduct of his business pending the settlement, which he fully expected to be consummated, and that the failure to show these moneys in the schedules attached to the petition in bankruptcy was because he left the matter wholly to an employee in his office, believing that under the circumstances the petition was a mere formality to give jurisdiction to the bankruptcy court over the proposed composition. The general ledger of the bankrupt was introduced in evidence showing the monthly balances in the "Auerbach Special" and "Auerbach Special A" accounts. It was testified by Auerbach and by the bookkeeper in charge of the books of the bankrupt that all expenditures from these accounts and all deposits therein were shown in the books of the bankrupt. Canceled checks were introduced by the government covering most if not all of these expenditures. It was stipulated "that all of the money that was in either one of these special accounts was disbursed by Mr. Auerbach, as shown by these checks, at the request of Mr. Hersh; that the checks were for what they purport to be upon their face, for merchandise, for rent, and for other miscellaneous things." The effect of this stipulation is that all the money in the two accounts "Special" and "Special A," and much more, were expended in the conduct of the business long before the trustee was appointed. As to the deposit in the bank by Klein, it is shown that the money was all withdrawn by the end of July, and Klein testified that the full amount of $6,451.55 was returned by him to Hersh before the trustee was appointed. The bookkeeper of the bankrupt, Mrs. Bonn, testified that the return and expenditure of this money was shown by her accounts receivable cards and that these cards were turned over to the attorneys for the trustee. It is not disputed that the creditors fully expected the bankrupt to continue business until the agreed composition was effected and indeed the bankrupt continued to purchase merchandise on a cash basis from many of the creditors who had theretofore furnished supplies, and checks in payment therefor were issued by Auerbach, signed by Auerbach "Special A" or "Special," as the case might be. The defendant Auerbach testified fully to the expenditures made by him and testified concerning several hundred checks drawn upon these accounts and that he believed that all such withdrawals were made for the purpose of the business being conducted by the bankrupt. Auerbach was an accountant employed by twenty-five or thirty merchants. The creditors desired that the moneys derived from the business should pass into the hands of a disinterested third person as a check on the business transactions involved in the continuation of the business during the arrangement of the compromise. It is obvious that the transfer of money to the Auerbach special accounts was calculated to delay creditors and Auerbach testified that the transfer was designed for that express purpose so as to continue the business during the negotiations for compromise, but according to the testimony, most if not all the creditors or their representatives were advised of the transfer and participated in the arrangement therefor. As to such creditors it is clear that there is no concealment of these funds. As to the money belonging to the bankrupt deposited by the appellant Klein, the purpose of such transfer and deposit was evidently two-fold, one to delay creditors pending the settlement, and the other to keep in a separate account funds which were in part exempt from the claims of creditors. The bank account of Klein was rapidly reduced after the deposit of July 10, 1930, until on July 18th the balance was $769.83, on July 26th $159.96, and on August 1st $29.-71, but his deposits for July, 1930, were $8,-

844.75, for August $3,829.71, for September $4,620.48, and for October $9,530.24. Appellant Klein admitted that some of these withdrawals previous to July 18, 1930, were for his own account but testified that he was at all times in a position to pay the money when needed or demanded by the bankrupt, and that he did so. The only item of money in the Auerbach special accounts definitely traced into the possession of the defendants and retained, and which is not claimed by them to have been expended in the business, was the sum of $1,250 attorney's fees paid in September by Hersh to Klein. This was paid from the special deposits long after the original amounts therein deposited had been expended. Klein, in the report to the court in which he demanded additional attorney's fees, made no mention of the fact that he had received this $1,250, and the entries in reference thereto were of an equivocal character.

 In the light of all these facts it was essential to a correct determination of the matter that the jury be informed as to the rights of the bankrupt to conduct his business after the filing of his bankruptcy petition and as to his right to purchase goods and to expend moneys in the course of that business. Such information to the jury was vital to the defense interposed to the prima facie proof of original concealment arising from the transfer of funds to Auerbach and Klein. No such instruction was given by the trial court and none was requested by the defendants to that effect, although it was clear that under the law the defendant, acting in good faith, was entitled to conduct his business and to utilize his funds therein in paying the expenses of the conduct of such business until such time as a custodian, receiver, or trustee was appointed to take possession of the property notwithstanding the fact that the title of trustee, when appointed, relates back to the time of the filing of the petition in bankruptcy. The rule in that regard is thus stated in Remington on Bankruptcy, § 1393:

"§ 1393. Whether Bankrupt Retains Power of Disposal before Adjudication, unless Receiver or Marshal Takes Possession or Injunction Issues.—Unless the bankrupt's property be sequestrated by a receiver or marshal or the bankrupt himself be enjoined, the bankrupt retains the power to dispose of the property, after the filing of the petition, even until the date of adjudication, only to the extent, however, of dealing with it on presently passing consideration and in good faith, that is to say, only to an extent consistent with his quasi trusteeship."

The text is amply supported by decisions of the District Courts: In re Laplume Condensed Milk Co., 145 F. 1013; Gunther v. Home Ins. Co., 276 F. 575; In re Latex Drilling Co., 11 F.(2d) 373. The Circuit Court of Appeals of the Second Circuit, in dealing with the rights of creditors of an alleged bankrupt after petition in bankruptcy and pending an adjudication, stated the rule in Re Mertens, 144 F. 818, 823, as follows:

"The change in the present act, by which the trustee's title is that only which exists at the date of the adjudication, removes any uncertainty which arose under the act of 1867. It was intended, we think, to permit all legitimate business transactions between a debtor and those dealing with him to be carried out and consummated as freely, until he has been adjudicated a bankrupt, as though no proceeding were pending. In many cases the proceeding against an alleged bankrupt is unfounded, and for this and other reasons never culminates in an adjudication. While the filing of a petition in bankruptcy is a caveat to all the world, the notice ought not to have the effect of paralyzing all business dealings with the debtor, or to prevent lienors or pledgees from enforcing their contracts. This is its practical effect, if the rights and remedies of all concerned are in suspense, until it can be ascertained whether an adjudication is or is not to follow the commencement of the proceeding."

In American Trust Co. of Pittsburgh v. Wallis, 126 F. 464, 466, the Circuit Court of Appeals of the Third Circuit held that the referee had no power to order a turn over of property collected and disposed of by the bankrupt in good faith after the filing of the petition in bankruptcy and before adjudication. We quote therefrom as follows:

"In the absence of fraud or concealment, the bankrupt court can only order the delivery of property to the trustee which the bankrupt is physically able to deliver up, having the same in his possession or control. If it shall appear that he is not physically able to deliver the property required by the order, then, confessedly, proceedings for contempt, by fine and imprisonment, would result in nothing, certainly not in a compliance with the order. The contempt in this case could only be purged by a reiteration of the physical impossibility to comply with the order whose disobedience is being thus punished. An order made under such circumstances

would be as absurd as it is inconsistent with the principles of individual liberty. But it may be said that, to have collected this money from his debtors and distributed it to his creditors, with knowledge of the filing of the petition in bankruptcy, was in contempt of the bankrupt law and of the proceedings in bankruptcy, which were a caveat to all the world as to the effect of such proceedings upon the property of the bankrupt in case he should be so declared. This, however, would but be a constructive contempt, and not liable to the summary punishment by fine and imprisonment which may be inflicted for actual contempt, committed in the presence of the court or by open and defiant refusal to comply with its lawful commands, where compliance is physically possible.

"The bankruptcy court is clothed with power, when the circumstances appear to it to warrant such proceedings, to have the bankrupt's property seized by a marshal or special master, immediately upon the filing of the petition in bankruptcy. This power is a summary one, and can be exercised upon an ex-parte suggestion, and was intended to meet the inconvenience suggested by appellant, of allowing the property of the bankrupt to remain in his possession and control and liable to be unlawfully made away with or concealed in the interval between the filing of the petition and the appointment of a trustee. A provision of this kind, however, cannot always perfectly protect the creditors in their right to have the whole estate of the bankrupt segregated and guarded for their benefit. It does so as nearly as it can, with due regard to fundamental principles and policies. It is better to fall short of an absolutely perfect administration of the theory of the bankrupt law, than to arm referee or court with powers of oppression alien to the spirit of our laws and institutions. A careful examination of the authorities cited by the appellant discloses no case which would justify the making of the order asked for by the appellant."

It seems to have been assumed throughout the trial that this was the law and that it was a defense to the charge to show, if it could be shown, that the moneys charged to have been concealed were actually expended in good faith in the business, although the trial judge did remark during the examination of the defendant Klein on the trial, and in the presence of the jury after defendant Klein had testified that he withdrew moneys from his account for his personal use during July and August, "That is exactly what he is charged with, concealing and not turning it over to the trustee. What he did with it, whether he spent it or what not, it amounts to concealing." The court was reminded that the trustee was not appointed until long after these withdrawals, but replied, "That doesn't make any difference. If money came to his hands belonging to the estate and was not accounted for, to be turned over to the trustee under the law it would be concealment." These statements were made after Klein had testified that he had repaid Hersh the full amount derived from the insurance loans. Exception was reserved to these remarks.

The defendant Hersh did not take the witness stand, relying in part upon the presumption of innocence and upon evidence of good character, and in part, no doubt, upon the testimony of his codefendants Klein and Auerbach. The burden of proof was upon the government to show the concealment of the funds alleged in the indictment. In view of the fact that the concealment relied upon consisted in the transfer of moneys to Klein and Auerbach several months before the trustee qualified, it was essential to show that this concealment continued down to the time the trustee was appointed and thereafter, with intent to deprive the trustee and the creditors of the aforementioned sum. As we have pointed out, the original concealment involved in the transfer of the money to Klein and Auerbach was accompanied by a disclosure to most if not all the creditors. Our attention is not called to any creditor who was not present or represented at the meetings where the setting up of these special deposits was arranged for. Under such circumstances there was no such concealment from the trustee as constitutes a crime under the Bankruptcy Act (11 USCA) at the time of the transfer. Even if there were then a concealment of money, the burden was still on the government to show that the fund was concealed at the time the trustee was appointed and qualified. In the absence of other testimony, proof that these moneys were never turned over to the trustee might make a prima facie case of concealment from the trustee, but where the business was conducted for months after the original transfer and during that period the bankrupt had a right to deal with the property as his own subject to the condition of good faith toward his creditors, the presumption of innocence would require the presumption that the moneys had been properly expended.

It is clear that, if this money had been expended legitimately by the bankrupt before the trustee was appointed, there was and

could be no concealment of property which belonged to the bankrupt because at the time the trustee qualified it would not belong to him. The only testimony as to what was done with this money was that of Klein and Auerbach fortified and corroborated by the bank accounts involved, and the testimony of the bookkeeper, Mrs. Bonn, as to the contents of missing records, and so far as Auerbach is concerned, fortified by checks issued by him on the bank accounts carried in his name.

■ With reference to the Auerbach accounts, the evidence is very clear that large amounts were expended from these accounts in the conduct of the business and the presumption of innocence would require a decision that, if more than the original amounts set forth in the indictment were thus properly paid out before the trustee was appointed, the parties were not guilty of concealment of the original amount so expended before the appointment of the trustee even if other amounts subsequently deposited in these accounts were improperly expended. The charge here is concealment of specified amounts. There was some evidence of destruction of books and vouchers involving the Klein account, and some evidence concerning the books of the bankrupt which bear upon the question of guilt that we have not referred to heretofore. Our statement of the facts and of the evidence has been made for the purpose of presenting the questions involved in the instructions to the jury and the rulings of the court rejecting instructions proposed by the defendants. Hence, we have stated some of the testimony which the jury may have disbelieved. We are not deciding that the jury should have been instructed to acquit the defendants.

The instructions of the trial court to the jury were very elaborate, covering some twenty pages of the typewritten transcript. The appellants requested 93 instructions, and in addition thereto, appellant Hersh requested 30 instructions. A few of these instructions were given but most of them refused and exceptions were properly taken by the appellants to the refusal of those instructions. Several additional instructions were given at the request of the defendants, the general purport of which was that the jury could consider all the facts and circumstances of the case to determine whether or not there was a concealment of property wilfully with fraudulent intent, and that in case of a reasonable doubt or of an equal balance of the testimony the jury should acquit. Two of the instructions proposed and given we quote be-

cause they require an acquittal if the moneys alleged to have been concealed had been expended in good faith in the conduct of the business before the trustee in bankruptcy was appointed.

"No. 18. I instruct you that in order that these defendants, or any of them, be guilty of the offense or offenses charged, you must find that the property in question was concealed by them in anticipation of the bankruptcy of said David Hersh, and that the concealment thereof was a continuing one after the trustee was appointed, and that unless you find beyond a reasonable doubt and to a moral certainty each of the above facts, then the defendants would be entitled to a verdict of not guilty.

"No. 20. I instruct you that in order to sustain the charge in this case it is incumbent upon the Government to prove beyond a reasonable doubt and to a moral certainty that the defendants herein, prior to the bankruptcy of the defendant David Hersh concealed or attempted to conceal, or conspired to conceal the property of the said bankrupt and continued to conceal the same from the trustee after his appointment. So the concealing and withholding may have been begun and the intention and purpose of the scheme may have anticipated the appointment of a trustee long before the trustee was appointed, but the retaining, or withholding, or concealing would have to continue after the trustee was appointed, because the trustee is the official representative of the creditors of the estate, and it is necessary, in order to constitute the offense, that there should be a withholding from the trustee of that particular estate."

■ As to the other instructions on this subject refused, the appellants content themselves with a reference to fifteen instructions proposed by them by number, and the general statement that, "A reading of the general charge will disclose that the trial judge made no attempt whatever to explain or to instruct the jury as to what would constitute a criminal concealment and the jury was left in helpless ignorance on that important subject." The government's reply brief is equally brief. Nevertheless, we have examined these refused instructions and each one seems to be a correct statement of the law and should have been given unless the instruction was given elsewhere in substance and effect. In addition to these instructions the appellant Hersh complains more specifically of the court's refusal to give his instructions Nos. 10, 11, 28, 29, and 29½. We think instruction No. 10

should have been given and is not clearly covered by any instruction given. This instruction is as follows:

"Instruction No. 10: You are instructed that, under the evidence presented before you, the defendant Hersh, instead of at first going directly into bankruptcy, sought to avoid that extreme and resorted to what is known, in the bankrupt law, as a composition. In this connection, I instruct you, that the estate of one who is financially involved or who is a bankrupt may be wound up under the bankrupt law, in but two ways: First, by distribution in bankruptcy, or second by distribution in composition. The defendant Hersh at first chose the latter, according to the evidence presented before you and sought to avoid bankruptcy by effecting a composition or compromise with his creditors.

"In this connection I further instruct you, that the bankruptcy statute authorizes one who is financially embarrassed to effect a composition with his creditors instead of becoming a bankrupt and that the defendant Hersh, in consulting his attorney for that purpose and endeavoring to effect a composition with his creditors, was well within his legal rights and if you believe from the evidence that he acted in good faith in doing so and made every reasonable effort to comply with the original terms of his offer of composition and did not conceal any of the moneys or other property referred to in the indictment in this case, then it is your duty to find him not guilty."

Instruction No. 28, requested by defendant Hersh, should have been given. It is as follows:

"You are instructed that the evidence showed that the defendant Klein acted throughout all the bankruptcy proceedings as the attorney and legal advisor of David Hersh.

"Inasmuch as none of the defendants on trial can be found guilty of the offenses charged in those two indictments unless you are satisfied by the evidence beyond all reasonable doubt that they had the intent to defraud set out in the two indictments, I further instruct you, as to the defendant Hersh, that in whatever the evidence may show he did or did not do, if he followed the counsel and advice of his attorney, defendant Klein, in whatever he did or did not do, and if he did so in good faith and without any intent to defraud, it is your sworn duty to find him not guilty or if you have any reasonable doubt upon that question it is your duty to give him the benefit of that reasonable doubt and find him not guilty."

While it is true that the advice of an attorney is not of itself a defense to the crime of concealment of property, nevertheless, it is an element to be considered in determining the good faith of the defendant. In order that concealment of the property of a bankrupt may be punished as a crime, it must be "knowingly and fraudulently" concealed (11 USCA § 52 (b). Indeed, if he so acted without the advice of an attorney, he was entitled to an acquittal certainly with that advice he should have been acquitted. Any fact tending to show lack of intent to defraud by concealment is proper to be considered by the jury. See U. S. v. Conner, 3 McLean, 573, 25 Fed. Cas. page 595 No. 14,857; U. S. v. Stanley, 6 McLean, 409, 27 Fed. Cas. page 1292, No. 16,376; Cochran v. U. S., 157 U. S. 286, 15 S. Ct. 628, 39 L. Ed. 704; 16 C. J. 85, §§ 52, 53; Barnett v. State, 89 Ala. 165, 7 So. 414; Lambert v. People, 76 N. Y. 220, 32 Am. Rep. 293.

Instruction No. 63 requested by both defendants was refused and the refusal excepted to and assigned as error. This instruction or its equivalent should have been given. It was not sufficiently covered by instructions given. It is as follows:

"I instruct you that in this case there has been some evidence offered and received to the effect that some of the property alleged to be the property of said bankrupt, was retained and disposed of by some or all of said defendants, after a time when it could be reasonably anticipated that bankruptcy proceedings would be instituted. I instruct you that in this case such proof is not sufficient of itself upon which to justify you in returning a verdict of guilty against any or all of said defendants. Before you can find any or all of said defendants guilty, you must further find that such retention of said property of said bankrupt was done with the fraudulent and unlawful intent to conceal said property from the said trustee in bankruptcy or any other interested person or persons.

"If you find that the course of conduct pursued by said defendants or any of them, in retaining, handling, administering or disposing of any of said property belonging to said bankrupt was not done or accomplished in such a manner as would tend to conceal, secrete or hide said property from said trustee or other interested person or persons, I charge you that in this case it is your duty to find said defendant or defendants not guilty."

 Defendant Hersh also requested instruction No. 29½, as follows:

"I further instruct you that you are not to draw any inference or impression unfavorable to the defendant Hersh simply because he did not take the witness stand and testify on his own behalf. A defendant has the right not to take the witness stand in his own behalf. He is presumed to be innocent and the burden of proving him guilty is on the prosecution and it must do so beyond all reasonable doubt and to a moral certainty and no unfavorable inference can be indulged in by the jury against the defendant Hersh because he did not take the stand and testify in his own behalf."

This instruction was given in part but that part of it which instructed the jury that in case of failure of a defendant to testify no "unfavorable inference can be indulged in by the jury against the defendant," for failure to testify was not given. The statute expressly provides that the defendant may on his own request, but not otherwise, be a competent witness "and his failure to make such request shall not create any presumption against him." (28 USCA § 632) During the examination of the witness Klein the court stated "the jury merely wants to listen to the defendants and find out their explanations of these several things—I assume." While this statement was not objected to at the time and no exception reserved thereto, because of it defendant Hersh was entitled to have the jury instructed, as requested, that the failure of the witness to take the stand should not count against him. This error was prejudicial as to Hersh. It is well settled in the federal court that where a correct proposition of law essential to the proper determination of the issues submitted to the jury is proposed by the defendants and the same is not given either in substance or effect, and the jury is not properly advised thereon by the general charge of the court, the refusal to give such instruction is error. Hendrey v. U. S. (C. C. A.) 233 F. 5, 18; Calderon v. U. S. (C. C. A.) 279 F. 556. In the case at bar we hold that the broad general statements of the court in its instructions concerning concealment were entirely inadequate to properly advise the jury of the rights, duties and obligations of the defendant and upon what constituted the crime of concealment under the peculiar circumstances of this case.

 While it was error to consolidate the two indictments for trial in view of the fact that Auerbach was a defendant in one indictment and not in the other, in view of his acquittal the two indictments now may be properly consolidated if a new trial is had.

There are one hundred ninety-five assignments of error covering one hundred eighty-one pages of the typewritten transcript. Many assignments of error relate to the alleged misconduct of the trial judge. These specifications largely relate to the manifest impatience of the trial judge with the amount of time taken by the attorneys in the presentation of the defense. The attorneys for the defense were persistent and insistent, but courteous and respectful. The defendants were compelled to either rely upon the presumption of innocence, where they had admittedly possessed property that should have been turned over to the trustee and which had not been turned over to him, or to attempt to account for such money, involving an accounting for expenditures and receipts of an extensive business for nearly four months. In the main we think the rebukes of the court were not justified, and in some instances they were so recognized by the judge and withdrawn. These assignments have been given serious consideration, but on mature deliberation the majority of the court do not consider that the court's comments passed beyond the legitimate bounds of the court's right and duty to expedite the trial of a case.

There has been considerable delay in the decision of this case due in part to the fact that, in the interest of economy, an imperfect typewritten transcript was permitted to be filed upon application of the appellants. The transcript is a cumbersome bundle of seven hundred thirty-six typewritten pages, some of which are carbon copies and are almost illegible. We now feel that this was a mistake as the burden of examination has been greater than the economy effected.

Judgment reversed.