**SHUSHAN et al. v. UNITED STATES.**

No. 9388.

Circuit Court of Appeals, Fifth Circuit.

Jan. 18, 1941.

Rehearing Denied March 3, 1941.

Warren O. Coleman, Warren Doyle, Hugh M. Wilkinson, John D. Lambert, W. J. Waguespack, Jr., Edward R. Schowalter, E. E. Talbot, and Rene J. Waguespack, all of New Orleans, La., Francis X. Busch, James J. Magner, and Morris I. Leibman, all of Chicago, Ill., and David V. Cahill, of New York City, for appellants.

O. John Rogge, Asst. Atty. Gen., Harold Rosenwald and Alfred B. Teton, Sp. Attys. Dept. of Justice, both of Washington, D. C., and Rene A. Viosca, U. S. Atty., and Robert Weinstein, Asst. U. S. Atty., both of New Orleans, La., opposed.

Before SIBLEY, HUTCHESON, and McCORD, Circuit Judges.

SIBLEY, Circuit Judge.

Abraham L. Shushan, Robert J. Newman, Norvin T. Harris, Jr., Henry J. Miller and Herbert W. Waguespack were convicted on seven out of eight counts of an indictment charging uses of the mail in execution of a scheme to defraud. All appeal, each appearing by separate counsel with separate briefs, and each makes more than a hundred assignments of error. It is impossible to discuss all of them. Many are urged by all the appellants; some are peculiar to those who assert individual defenses. In the general discussion to which space confines us, we will refer to matters relating to: 1. The finding and 2. The sufficiency of the indictment; 3. The refusal of a continuance and of a mistrial; 4. The proceedings against the newspapers; 5. The impanelling and conduct of the jury; 6. Admission of evidence and argument of counsel; 7. The charges and refusals to charge; 8. The sufficiency of the evidence.

1. Pleas in abatement of the indictment were filed which set up that no witnesses had testified before the grand jury to the deposit in the mail or delivery from it of the writings mentioned in the several counts, as shown by affidavits thereto annexed. The affidavits tended to prove that neither any sender nor addressee testified. The court struck the pleas as insufficient. Assuming that an indictment may be abated or quashed for a total want or illegality of evidence before the grand jury on an essential element of the offense, the affidavits annexed to these pleas and made a part thereof do not show such a situation. The prosecution may have proved the use of the mails by circumstantial evidence including postmarks on the documents; or postal employees may have been used as witnesses, or proof made of admissions by the accused. On the showing offered the court was not bound to halt the trial to see how much or what sort of evidence the grand jury had acted on. In the grand jury room guilt does not have to be shown beyond a reasonable doubt, but only as probable. The secrecy of the proceedings is not to be set aside on every request or suggestion of the person indicted, but only when there is probability of serious illegality. See Friscia v. United States, 5 Cir., 63 F.2d 977.

Other pleas in abatement set up that three persons, purporting to act as special assistants to the Attorney General, participated in the proceedings before the grand jury without having been specifically directed to do so by the Attorney General as required by statute; 5 U.S.C.A. §§ 312 and 315. On a trial of the pleas it appeared that each of the persons complained of had been commissioned and had taken an oath as required by Section 315. Each commission appoints the person named a special assistant to the Attorney General and specifically directs him to conduct in the

Eastern District of Louisiana proceedings in which the United States are interested, "including grand jury proceedings." In some of them there is express mention of violations in the said district of 18 U.S.C.A. § 338, and in others the violations are stated to have been by named persons "and other persons unknown." In none of them does the name of any person here indicted appear. All these commissions were issued just before or during the time of the grand jury investigation which resulted in this indictment. We think it appears that these persons had and acted in an official status with respect to this case, and that the authority of each extended specifically to appearing in grand jury proceedings in the Eastern District of Louisiana in prosecutions under the mail fraud statute. The mention of persons supposed to be guilty was too general to restrict the authority to cases against them only. When a grand jury, which is an inquisitorial body, begins an investigation it cannot be known in advance whom they will indict. See Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771, Ann.Cas.1912D, 558; Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L. Ed. 652. The words of Section 310, "When thereunto specifically directed by the Attorney General, [to] conduct any kind of legal proceeding", are mainly for the protection of the United States. They do not require the naming of the persons or the particular cases to be prosecuted. Mail fraud cases in the Eastern District of Louisiana were specifically enough mentioned here, and we think it would be going too far to hold, at the instance of the accused, that the appointees were exceeding their authority in conducting this proceeding. We have held that such a commission does not have to be filed in court. Belt v. United States, 5 Cir., 73 F.2d 888. There has been some diversity of opinion as to how specific it must be in mentioning particular cases, (See United States v. Amazon Ind. Chem. Corp., D.C., 55 F.2d 254); but we think no unauthorized intrusion into the grand jury room here appears.

■■ A third series of pleas in abatement set up as ground for annulling the indictments the presence of two stenographers in the grand jury room while evidence was taken. On trial of these pleas it appeared that one Carter had an annual contract with the United States, made by the District Attorney and approved by the Attorney General, to do court reporting. He furnished the stenographers objected to, on request of the district attorney, and the district attorney accepted their services, Carter paying them. By the Act of May 18, 1933, 48 Stat. 58, 18 U.S.C.A. § 556, was amended so as to prohibit an indictment being held insufficient "by reason of the attendance before the grand jury during the taking of testimony of one or more clerks or stenographers employed in a clerical capacity to assist the district attorney or other counsel for the Government * * *." These stenographers were employed in a clerical capacity to assist the district attorney. The statute does not require that they be permanently employed in the district attorney's office.

2. The indictment was demurred to as alleging no federal offense. In brief it charged the five defendants with knowingly and fraudulently having devised a scheme to defraud, and for obtaining money and property by false and fraudulent pretenses from the Board of Levee Commissioners of Orleans Levee District; and with having, to effectuate the scheme, deposited and caused to be deposited in the mails certain writings. The scheme was more particularly described by allegations that the defendant Shushan was lately a member and president of the Levee Board, that Waguespack was a member and chairman of the Finance Committee, Newman and Harris were in the bond business, and Miller a public accountant; that the Levee District had outstanding five series of bonds aggregating about five and a half million dollars principal, bearing interest at rates of 4¾ and 5 percent; that a plan for refunding them was to be proposed by Newman and Harris to the Board, including a provision to pay 25% of the savings effected; that Shushan was to corruptly influence Governor Leche to approve the plan, which approval was to be stated to the Board; that Waguespack as a Board member was corruptly to urge and influence acceptance of the plan; that Waguespack was to be paid a part of the fees received under the plan but surreptitiously and with concealment thereof; that Shushan also was to have a concealed share in the fees; that a bribe of $12,940 was to be paid one Fitere, an employee in the office of the Board, to spy and inform as to what competitors in the bond business might do; and the scheme was further to charge fees that were exorbitant and excessive and far beyond the value of the services rendered; that, on a saving of

$729,000 fees aggregating approximately $496,000 would be charged, which after paying said bribe and other expenses would be divided one-third to Shusan, one-half to Newman & Harris, and one-sixth to Miller; that Miller would pay 70 percent of his sixth to Waguespack and conceal the payment to Waguespack. The indictment then alleged that the representations and pretenses were false because the fees were exorbitant, that the Levee Board was, by the bribery of Waguespack, deprived of fair judgment of one of its members, who assiduously and corruptly influenced and persuaded the other members, and the defendants also bribed Fitere; that the saving was not what was represented, but was calculated upon interest savings in the distant future without discount; that all defendants joined Waguespack in his betrayal of his duty to the Board and in influencing the action of the other members; and all was done and intended to obtain sums of money from the Board and the taxpayers to be converted to the use of the defendants. The use of the mails, especially in paying and dividing the fees, was set out in several distinct counts.

The statute, 18 U.S.C.A. § 338, punishes one who places or causes to be placed in the mail, or causes to be delivered to the addressee, mail matter for the purpose of executing "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises", or other described schemes. This indictment seeks to allege a scheme to defraud and to obtain money by false representations. The principal false representation alleged is as to the savings made under the contract. But there may be a scheme to defraud by other means than express false representations. A scheme to get money unfairly by obtaining and then betraying the confidence of another, or by corrupting one who acts for another or advises him, would be a scheme to defraud though no lies were told. A scheme to get a public contract on more favorable terms than would likely be got otherwise by bribing a public official would not only be a plan to commit the crime of bribery, but would also be a scheme to defraud the public. The fact that the official who is bribed is only one of several and could not award the contract by himself does not change the character of the scheme where he is ex-

pected to have influence enough to secure the end in view. No trustee has more sacred duties than a public official and any scheme to obtain an advantage by corrupting such an one must in the federal law be considered a scheme to defraud. The essential immorality of an arrangement of that sort, or even the use of undue personal influence, is illustrated in Oscanyan v. Winchester Arms Co., 103 U.S. 261, 26 L.Ed. 539; Crocker v. United States, 240 U.S. 74, 36 S.Ct. 245, 60 L.Ed. 533; Crawford v. United States, 212 U.S. 183, 29 S.Ct. 260, 53 L.Ed. 465, 15 Ann.Cas. 392; United States v. Carter, 217 U.S. 286, 30 S.Ct. 515, 54 L.Ed. 769, 19 Ann.Cas. 594; Pan American Petroleum Co. v. United States, 273 U.S. 456, 500, 47 S.Ct. 416, 71 L.Ed. 734. We agree with appellants that the constructive frauds which equity in civil cases sometimes sets up to do justice will not suffice under this criminal statute; and that there must be a purpose to do wrong which is inconsistent with moral uprightness. So conceding, we think a scheme to defraud by corrupting an official and also by misrepresentation of results achieved is alleged.

3. The motions to postpone the trial are based on the fact that a State election was to be held six weeks later on Jan. 16, 1940, and that an issue in it was whether the existing political regime with which Shusan had been identified had been guilty of graft and corruption; and the newspapers had been very insistent for months on defeating and punishing the supposed grafters, and had devoted much front page space to the grand jury investigation of this and other related cases; printing several interviews with the Assistant Attorney General who was in charge of the prosecution. A candidate for governor was shown to have had on the wall of his headquarters a poster picturing Shusan and others in prison garb, and a street parade had been had with similar innuendoes. A large number of persons made identical affidavits that in their opinions a fair trial could not be had, because of the political situation and the newspaper and radio publicity. No details were given by the affiants. Numerous newspaper cartoons and articles were shown to the court. Petitions to hold the newspapers in contempt of court were made by the defendants and pressed on the attention of the court, but they were not acted on until after the trial was begun. Then by proceedings

out of the jury's presence, because of two publications just made, two newspapermen were punished for contempt.

We have merely sketched what was indeed an extraordinary situation. The trial might very well have been postponed; but the trial judge is a resident of New Orleans and was personally cognizant of the true situation, and the question we have is whether his discretion in refusing a continuance was so abused as now to require the annulment of the trial. We think that the prosecuting attorney's encouragement of the newspaper publicity about the case was ill-judged, and improper. Newspapers have the right to give the facts about proceedings in court and to make fair .and temperate comment on them. The newspapers here sometimes went too far, and the prosecuting attorney ought not to have contributed to what became an abuse. This, however, was before the trial started, and is only a part of the precedent public atmosphere. We think too much of what was published is now supposed to refer to Shushan. He was not an officeholder or a candidate, and the most of the newspaper and other activity was aimed not at him, but at political victory. The American public understands too well the methods of election publicity to take too seriously its utterances. The courts cannot suspend because an election is on and because the cases to be tried may have a political significance. They must consider the concrete question whether there is such public excitement as to prevent a calm judgment by jurors, and to make unreliable the usual methods of, obtaining an impartial jury. The trial judge thought an impartial jury could be obtained. A full enquiry was made of each juror as to his connections, his prejudices and predilections, what he knew about the case and had read about it, and all were excused who had any wish or opinion about it. The defendants did not exhaust their peremptory strikes. The jury finally empanelled was accepted by both sides. There was no proof of public turbulence or violence, or even of public excitement except among the newspapers and politicians. We are unable to say that the discretion of the presiding judge was abused. Cox v. State of Georgia, 64 Ga. 374, 375, 403, 37 Am.Rep. 76; 12 Am.Jur. Continuances, § 5, 18. The circumstances were similar in Hart v. United States, 5 Cir., 112 F.2d 128.

4. His refusal to punish the newspapers before the trial began is not assignable as error in this trial. Whether they were or were not then in contempt of court is a question between the United States and the alleged contemnors, and reviewable as a separate proceeding.

The punishment of the two publications made after the trial began was also a separate proceeding, not in the jury's presence. No appeal has been taken by the contemnors. A mistrial was asked because of these publications. The jury had been each day directed not to read the newspapers or listen to the radio or discuss the case among themselves or with anyone else, and to report to the court any effort at discussion. They were asked if they had seen the publication last complained of and said they had not. It did not appear that they had seen or heard anything else prejudicial. No ground for mistrial existed.

It is also argued that the selection of two alternate jurors was error because the statute authorizing it is violative of the jury trial provision in the Constitution. The alternate jurors were excused before the case was submitted for decision to the twelve first chosen. Presumably they obeyed the direction of the judge not to discuss the case with the other jurors. If they ought not to have been selected, no harm was done. There is no need to examine the constitutional question.

6. The contract between the Levee Board and Newman & Harris was made July 10, 1936. The prosecution contended that Waguespack and Shushan were concealed parties to it. To illustrate their connections with each other and probable intent in this contract the court admitted as against them only evidence of the "O'Neil transaction." This began in April, 1936, and was fully consummated July 16, 1936. It involved bonds of the Levee Board which were called and substituted by other bonds bid in by a syndicate, and then pursuant to a plan made beforehand substituted by a more valuable form of bond. According to the Government's evidence Shushan and Waguespack were secretly interested in the transaction and were paid $27,000 from the profits of the syndicate as a "finder's fee", which they shared $17,500 to Shushan and $9,500 to Waguespack. Waguespack cashed his check away from New Orleans and put the cash in his safety deposit box, as he did

with the several payments made him in the matter on trial. Shushan and Waguespack disputed some of this but the evidence showed a transaction near enough in time and like enough in substance to illustrate the motives and associations of Shushan and Waguespack in this case. The other defendants could not have it wholly excluded, but it ought to have no adverse effect on their contention that although Shushan and Waguespack may have schemed to defraud, their own connection with the matter was innocent. The judge, in admitting the evidence, and in his charge, restricted its use to the cases of Shushan and Waguespack. There was no error.

■ The books and records of Newman & Harris, containing entries about the transactions in controversy, were seized by a search warrant issued and executed by State officers in connection with a State charge of bribery. The prosecution here got them from the State officers and introduced some of them in evidence over objection that they were unlawfully seized. The objection turns on whether the federal officers were party to the seizure. Though there had previously been an exchange of information between the two groups of officers and cooperation in that way, the federal officers had nothing at all to do with the State's proceedings for the search. It does not appear that any action has been taken by Newman & Harris to vacate the search warrant or recover the papers. With the books in the hands of third parties the United States may use them, not having had any hand in taking them away from the owners. 14 Am.Jur., Criminal Law, § 154. Indeed we understand that they show nothing more than Newman & Harris admit to be true.

■■ Certified copies of income tax returns were used to prove receipt by the defendants Shushan and Waguespack of their part of the profits, over objection that they were thereby compelled to bear witness against themselves unconstitutionally. They do not claim that any disclosure at the trial was compelled by word of mouth or production of a paper, but that whatever incriminating statements were put in the returns in 1936 and 1937 were compelled by law, and in the nature of a confession, and inadmissible in a criminal case. The point is principally argued in behalf of Waguespack. His specifications of error do not point out the particular items in his returns objected to, but we suppose in the

1936 return reference is to: "11. Other income (State Nature). Personal fees and commissions $12,483;" and in the 1937 return: "6. Income (or loss) from partnerships, syndicates, pools, etc., (furnish names and address), Henry J. Miller, partnership, 1000 Maritime Bldg., N. O., La., $46,459." In the first item, as now appears, was included the $9,500 received in the O'Neil transaction, and in the second the income from the transactions here in contest. There is no mention of the Levee Board or anything to indicate an illegal source of the income. The general constitutionality of the statute requiring a return for taxation of all income, unlawful and lawful, is sustainable by reasoning similar to that by which a regulation requiring oil reports was upheld by us in Ryan v. Amazon Petroleum Corp., 5 Cir., 71 F.2d 1, 8, reversed on another point in Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446. We there suggested: "No criminal case is pending, and the immediate purpose is information and not prosecution. * * * But if he has committed a crime and is entitled to withhold evidence of it, he should at the proper time and on the specific ground that disclosure would tend to criminate him, assert the right to withhold the particular evidence." The case is not unlike that of a witness called to testify. He may not refuse to be sworn and tell what he knows, up to the point of his own involvement in crime. At that point he may claim his constitutional privilege and refuse to go further unless given full immunity. If he continues to testify without claiming his right to be silent, he waives it. If he feels that a refusal to speak will hurt him more than to disclose freely, or if he is so sure of his innocence (as Waguespack claims he was) as to have nothing to conceal, he may elect to speak out. If he does, his sworn testimony about the matter is no more inadmissible when prosecution arises against him than if he had spoken not under oath, or under compulsion of a subpoena. The duty to tell the facts when called as a witness, and to tell them truly under the compulsion of an oath does not constitute what is said a forced admission when no reluctance is made known, and no other pressure or inducement applied. 22 C.J.S., Criminal Law, § 733 and cases cited. We are speaking not of confessions, which are full admissions of guilt, but only of admissions of facts. See Id. § 730, 816. So the maker of an income tax return under oath, if he does not wish to disclose any fact which may tend to in-

criminate him, ought to withhold it unless specifically forced thereto. Otherwise his disclosures ought to be esteemed voluntary.

██ Numerous exceptions were taken to the language and arguments of the prosecuting attorneys in addressing the jury. In some instances the court rebuked them and directed the jury to disregard them. In others, he held that the force and validity of an inference drawn by counsel was for the consideration of the jury. The word "loot" was repeatedly used without rebuke as descriptive of the defendants' operations. It was used deliberately, and to mean that the defendants had intentionally plundered the Levee Board. Such in effect was the charge against them. While the term is strong, it is no more than in a murder trial to say that what is proven is murder. The argument on both sides was vehement and animated. We cannot say that in any instance error was committed in not further restraining it.

██ 7. Many requests to charge were proffered and not given, and exceptions were taken to some charges given. We find no error in the charge as given, and it covered the well framed requests fairly enough. We have found most difficulty in a request made by Miller in these words: "A person has the legal right to act and rely upon the advice of a reputable attorney, if he receives, acts and relies upon the advice in good faith. If you find that Miller's acts in this case were based on his honest belief in the correctness of his attorney's advice, he would not be guilty because of any act based upon his reliance in good faith upon that advice, even if such advice subsequently prove to be erroneous." The court's charge clearly stated that a knowing and intentional fraud was necessary to be proved as to each defendant, and that a person acting in good faith would not be guilty. Miller specially urges the refusal of his request because he alone was claiming advice of counsel to protect him. If he had asked the court to say to the jury that advice of reputable counsel given on full disclosure of the facts and followed in good faith would be a matter to be considered by the jury in determining Miller's guilt, the request ought to have been granted. Hersh v. United States, 9 Cir., 68 F.2d 799, 806; Miller v. United States, 4 Cir., 277 F. 721, 726. It went too far in asking the court to erect erroneous advice of counsel into a legal barrier against guilt. The cases cited in which it is such, are cases of torts like malicious prosecution, in which such advice rebuts the charge of malice or establishes probable cause. The criminal law recognizes no such fixed rule. Counsel's wrong advice that one might lawfully kill another, though followed in good faith, would not as a matter of law bar a conviction for murder. The requested instruction moreover assumes that Waguespack advised Miller as his counsel. The evidence would justify the conclusion that he was Miller's partner, taking 70% of the profits as such, and not a lawyer who had no interest save to give sound advice for a reasonable fee; and that the question investigated by Waguespack was not what Miller might honestly do, but whether Waguespack would violate the State's criminal statutes in joining in Miller's enterprise—that Waguespack was advising himself rather than Miller. In the form the request was offered it was not error to refuse it.

8. It is very earnestly urged by each defendant that on the evidence each should have had an instructed verdict because no fraudulent scheme at all was proven but only a lawful business contract which resulted not in loss but in benefit to the Levee Board; and that each, with his acts, knowledge and intent alone considered, is proven to have done nothing amiss, no matter what others may have done. Miller contends he did nothing but furnish the idea that the bonds could be refunded, and that the contingent compensation accompanied by a deposit to guarantee the Levee Board against loss in the attempt would be attractive, taking Waguespack into the plan as an old friend and his personal attorney on Waguespack's assurance that he could lawfully take part; that Shushan was brought in as a man of means and experience to give weight to the guaranty deposit and assist in the refunding, and that Miller afterwards did nothing but receive his share in the fees and pay Waguespack his part, and as an accountant make out the various income tax returns to truly show the results. Shushan contends that he came in as Miller says, but suggested that practical bond dealers were necessary and got Newman and Harris to handle the business with Miller's consent and on a new division of the fees; and that he did not know about Waguespack's connection with it, and did nothing himself to influence the Board or deceive it. Newman and Harris say that Shushan got them into the enterprise, that

they knew nothing about Waguespack, handled the refunding openly and fairly and skillfully, and settled with the Board honestly and according to contract, and with Shushan and Miller according to their agreement. Waguespack admits he knew of the arrangements with Shushan and Newman and Harris, and that he acted with the Board without disclosing his interest in the matter, and received 70% of what was paid Miller, but maintains that he believed that he had a right so to do, that all was done for the best interest of the Board and so far as his intentions went was not fraudulent but honest.

The Government contends that Waguespack and Shushan probably conceived the plan, by reason of other experiences together, that Miller was mainly used as an accountant to keep income taxes straight, because Shushan, and others of greater notoriety, had had trouble in that quarter with fraudulent or illegal operations; that Shushan's part was to use his personal influence with Governor Leche, who could veto any refunding; that Waguespack was to manage matters before the Board; that Newman and Harris if they did not originally collaborate with Shushan and Waguespack were well aware of the arrangement, and were to put themselves forward as the sole actors, concealing the interest of the others, and to be rewarded, not by the usual fees or profits of bond dealers, but by an unprecedented and exorbitant contingent compensation, to be misinterpreted to the Board so as to almost triple it by claiming a settlement in cash for a fourth of interest savings to accrue many years in the future; the profits to be divided one-half to themselves, one-third to Shushan, and one-sixth to Miller, who was secretly to turn over seventy percent to Waguespack. The Government contends that an employee in the office of the Board, Fitere, suggested by Shushan, was during the period of a year covered by the operations, paid over $12,000 as a bribe by Newman and Harris, to spy on occurrences in the Board office; that the payments when made and divided were handled not by local checks, but by cashier's checks issued by banks in New York and Chicago which left no local record; that Waguespack's payments were all in currency and not put in bank, but kept in a safety deposit box; that Newman and Harris denied that they had any partners in the matter, and that other circumstances showed devious operations and a fraudulent intent on the part of each participant.

It is not true that because the Board was to make and did make a saving by the operations there could not have been an intent to defraud. The great demand for tax exempt bonds and the fall in interest rates on them, gave a potential profit to the Levee Board in refunding its callable bonds which bore a high rate of interest. That potential profit, all of it, was the property of the Board. These defendants had no original right to any of it. They could get no share except by some arrangement with the Board. If the arrangement was not fair, but intentionally fraudulent, the Board was to be defrauded of a part, though not all, of its property. But the defendants in fact did not receive, and it may be concluded, did not intend to receive, a share in the profit, realizable in the long future, but they received cash, to the amount of nearly a half million dollars, out of the proceeds of sale of new bonds. This cash unquestionably was the money of the Board. If any of it was got by fraud, that fact is not changed because more or all was not so gotten.

The transaction with the Board was on its face a business deal. The refunding, in three instalments, of about half the callable bonds was accomplished within the time the contract was to run, with skill and success. The old bonds were callable at 103, some at 105, and bore interest at 5%, some 4¾ percent, and were to run some of them for over thirty years. The new bonds had lessened interest, were callable at 110, and brought a premium which with interest savings over the entire period, undiscounted, added up to nearly $2,000,000. Any fraud about it must lie in the obtaining of the contract or in the settlements under it. But if there was fraud there, the skill and success of the refunding is not a defense.

The testimony of the defendants as to what they did, what they severally knew, and intended, is not conclusive on the jury. They are permitted to be witnesses, but witnesses having a great and direct interest in the result of the trial, and subject to strong temptation to distort the truth. Their manner and demeanor as witnesses the jury could also consider. And there were many contradictions by other witnesses and by circumstances. All these considerations made the weight to be at-

tached to the testimony of each a jury question. Their testimony in itself would not require acquittal unless believed.

■ The other evidence is, we have concluded, sufficient as to each to authorize conviction. The great stone of stumbling is Waguespack. He had been a member of the Board for seven years, and was Chairman of the Finance Committee, apparently without other members on it. He was a lawyer, and his advice and opinion had weight with the Board. In the adoption of this contract, and in the several refundings under it, according to the stenographic reports of the meetings, he did most of the questioning and arguing with Newman and Harris, made most if not all of the motions to accede to their proposals, and voted for them. The votes were always unanimous. No other member of the Board knew or suspected his interest in the matter. He says he concealed it lest it might influence them to be more favorable. We think the jury could well conclude that in his position his conduct was so irreconcilable with public duty and private morality that neither he nor anyone privy to it could intend fairness and honesty. He says that members of the Board were allowed to deal with it, except as to work and materials for levees. If so it must have been on their disclosing their interest and refraining from acting with the Board. Waguespack says he convinced himself that he could be honest in this matter by consideration of a joint resolution of the Louisiana Legislature passed in 1898, Act No. 10, and a statute in 1906, Act No. 128. Each is prohibitory and not permissive. The former states that no levee commissioner, officer or employee should become interested directly or indirectly in any contract for the building or repair of any levee work. The latter makes it a misdemeanor for a member of any public board to vote to award any contract for the performance of work, or the furnishing of materials to any partnership of which he is a member, or to do any other act to secure such award by the board of which he is a member to any such partnership; or to be interested pecuniarily in the profits to be expected to be derived from the performance of such contract. He narrows the penal statute by the resolution, so as to confine it to levee work and material, and thus to exclude the work of refunding and refinancing. Even if in voting for the award of this work to Newman & Harris, in which he was directly interested, but secretly, he did not violate the letter of this statute, we think the jury could hold his conduct nevertheless to be intentionally fraudulent. His claim that his 70% of Miller's share was a fee for a legal opinion and for his suggestion that to be legal the proposed contract should expressly exclude the refunders from bidding on the new bonds, is hardly credible. Lawyers often get contingent fees for active litigation, but rarely if ever make more than 50%. The work in this case was to be done wholly by others. The claim that the lawyer's large percentage is due to his assuming the expense of preliminary work does not hold, for all the expense was with Waguespack's concurrence finally assumed by Shushan and Newman & Harris, and he was never called on to assume or pay anything. Yet he was paid the full 70%. The pains taken on each transaction to pay him in currency, which he never put into bank though the amounts were large, go to show that both he and Miller well knew that his interest in the matter must be kept dark. And the devious methods Newman and Harris took to pay Miller tend to show the same thing, and are not well explained by them as a means of keeping the bidders, particularly the local banks, from suspecting that Newman and Harris were so interested that they could not bid. The contract which expressly forbade their bidding was of public record on the minutes of the Levee Board.

Shushan denies he had any role except to present the idea to Newman and Harris and assume half the expenses. Yet he was close to Governor Leche. The Governor did telephone the Levee Board to the effect that the proposed contract had been submitted to him and it looked good. Newman stated the Governor favored it. When later a delay occurred in getting an authorization order from the Governor's board it was Shushan who took it up with the Governor, signing himself familiarly "Abe". It was shown too in the O'Neil transaction which was being closed out when this one started, that Shushan and Waguespack had been associated in a somewhat similar deal in Levee Board bonds. The assumption of half the guaranty deposit of 1% was not very serious as matters were worked. The whole amount of callable bonds was not dealt with at once, but only a part. The old bonds were not first called and then new ones attempted to be sold, but the new bonds were first offered and only after a satis-

factory bid was obtained were the old ones called in and the new issued. There was really small chance of great loss. It did happen once that, due to unusual conditions of flood in the Mississippi River, an issue could not be sold and there was a loss, but paid out of previous profits. Shushan lost none of it.

Shushan was a party to the employment of Fitere (deceased at the time of trial) as a spy in the Board's office, for a compensation about seven times his salary. His duties are not clear. It is argued that Shushan and Newman and Harris would not need him to spy on the Board if they had known they had Waguespack. But Waguespack did not stay in the office of the Board but in his law office. They say that Fitere got such sums because he "held them up". How could he, unless they were doing something very wrong of which Fitere knew? And the first "hold up" was for $6,000, yet they continued to pay him as much again over a period of six more months.

The written contract presented to the Board and accepted by them provided as to payment: "The total payment and compensation to be made us by your Board pursuant to this agreement shall be 25 percent of the saving and gain effected by your Board through the refunding operation or refunding operations which may be designated by us pursuant thereto." We think this would be construed to mean, "as, if, and when effected." The gain being almost wholly in reduced interest payments on the same principal sums over a long term of years, Newman and Harris would not be entitled to their fourth of a saving in interest until it accrued; for the year 1950 (for example) only at the end of 1950. A court would not consider it recoverable in 1937, or if recoverable then would reduce it to its present value at a rate of discount found to be justly applicable. This is what is done when in contract or tort cases damages are awarded because of losses to be suffered in the distant future. See Chesapeake & Ohio R. Co. v. Kelly, 241 U.S. 485, 36 S.Ct. 630, 60 L.Ed. 1117; St. Louis-S. F. R. Co. v. Floyd, 146 Okl. 42,

293 P. 250, 77 A.L.R. 1439. Three months after the contract was made Newman & Harris wrote the Board a letter in one paragraph of which they stated they understood the savings and gains to be computed by taking the total interest payable on present bonds, less interest payable on refunding issue, less the premium paid on calling the old bonds plus premium realized on the new bonds, to be paid on each issue refunded. This letter was not acted on in any board meeting, but after telephone communication with each member the president pro tem. wrote a letter stating this was in accordance with the agreement. The settlements actually made used the arithmetical total of all future interest, with no account of the time element. The government witnesses say the amount thus demanded in cash was about three times what it should have been. It greatly increased the cash needs of the Levee Board, which had in each instance to get money from the State Treasury to pay. Since a public board as a general rule can take action only in a meeting, these letters probably made no change at all in the contract. The defendants assert that they are but an honest interpretation of the contract in accord with the practice of bond dealers. The Government shows this method of computing the gain was to have been set out in the form of contract at first prepared for Newman and Harris by a lawyer, but claims it was deliberately omitted in the form submitted to the Board with the purpose of covertly getting it in by letter afterwards. Under all the testimony the settlements thus figured seem to us so exorbitant and unreasonable as to indicate fraud or mistake in a civil proceeding. Yet we should hesitate to rest a criminal conviction for fraud on it alone. When taken, however, in connection with Waguespack's official position and conduct, and the other facts we have set out together with the rest of the evidence, which we have been unable to set forth completely and in detail, we think it was clearly a jury question whether there was a scheme to defraud, and whether each defendant was a party to it. The use of the mail to execute it is plain.

Judgment affirmed.